IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN KNOEFEL, | ) | Case No. 1:20-cv-1529 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| MICHAEL PHILLIPS, WARDEN,[1] | ) | |
| | ) | **REPORT AND** |
| Respondent. | ) | **RECOMMENDATION**[2] |
| | ) | |

Kevin Knoefel had a sexual relationship with his 18-year-old foster daughter and planned

with his foster daughter to murder his wife.  His foster daughter stabbed his sleeping wife

178 times.  He then collected over $790,000.00 in life insurance and related payments.  A Lake

County, Ohio jury convicted him of sexual battery and complicity to commit aggravated murder.

And he was sentenced life imprisonment and other sanctions.  Knoefel, through counsel, now

seeks a writ of habeas corpus under 28 U.S.C. § 2254 on the grounds that his convictions in *State

v. Knoefel*, Lake Cty. Ct. Comm. Pl. Case No. 13-CR-558, violated his federal constitutional

rights.  ECF Doc. 1; *see also* ECF Doc. 1-1.[3]  Because all of Knoefel's claims are procedurally

---

[1] Michael Phillips was warden of Northeast Ohio Correctional Center when Knoefel filed his petition, but
David Bobby is now warden of that institution.  *See* Northeast Ohio Correctional Center,
https://www.corecivic.com/facilities/northeast-ohio-correctional-center (last visited April 7, 2021).
[2] This matter is before me by an automatic order of reference under Local Rule 72.2 for preparation of a
report and recommendation on Knoefel's petition.  Chief Judge Patricia A. Gaughan also issued a
differential case management initial order for administrative track cases reflecting the automatic order of
reference.  ECF Doc. 2.
[3] Respondent Warden Phillips filed a return of writ on November 18, 2020.  ECF Doc. 7.  And Knoefel
filed a traverse on December 17, 2020.  ECF Doc. 9.

defaulted, non-cognizable, and/or meritless, I recommend that all of Knoefel's claims be DISMISSED and that his petition for writ of habeas corpus be DENIED.  I further recommend that Knoefel not be granted a certificate of appealability.

## I.     State Court Procedural History

### A.     State Trial Court, Case No. 13-CR-558

On August 8, 2013, a Lake County, Ohio, grand jury indicted Knoefel on: six counts of sexual battery in violation of Ohio Rev. Code § 2907.03(A)(5) ("Counts 1-6"); one count of conspiracy to commit aggravated murder in violation of Ohio Rev. Code § 2923.01(A)(1) ("Count 7"); one count of conspiracy to commit aggravated murder in violation of Ohio Rev. Code § 2923.01(A)(2) ("Count 8"); one count of complicity to aggravated murder in violation of Ohio Rev. Code §§ 2923.03(A)(1) and 2903.01(A) ("Count 9"); one count of complicity to aggravated murder in violation of Ohio Rev. Code §§ 2923.03(A)(2) and 2903.01(A) ("Count 10"); and one count of complicity to commit aggravated murder in violation of Ohio Rev. Code § 2923.03(A)(3) ("Count 11").  ECF Doc. 7-1 at 5-11.  Specifically, the indictment alleged Knoefel had sex with his 18-year-old foster child Sabrina Zunich on or between October 27 and November 16, 2012.  ECF Doc. 7-1 at 5-7.  And, on or between August 1 and November 16, 2012, Knoefel: (1) planned with Zunich to kill his wife Lisa Knoefel ("Lisa") while she was sleeping because she was "worth more dead than alive"; (2) directed Zunich to use a specific knife; (3) instructed Zunich on how and where to stab Lisa; (3) instructed Zunich to make the slaying appear like a burglary by rummaging through jewelry, leaving a door open, and cutting her own legs to give the impression of self-defense; and (4) agreed with Zunich that she should deny memory of the slaying or claim insanity if apprehended by the police.  ECF Doc. 7-1 at 7-11.  As planned, Zunich stabbed Lisa to death.  ECF Doc. 7-1 at 7-11.

2

Knoefel pleaded "not guilty" to all charges on August 16, 2013.  ECF Doc. 7-1 at 12.  On

January 10 and 22, 2014, the state trial court held a hearing on a motion to suppress that Knoefel

had filed.[4]  ECF Doc. 7-1 at 192; ECF Doc. 8-4.  During that hearing, the court denied Knoefel's

motion to suppress:

> 2.  All recorded telephone calls and/or text messages from June 4, 2012, through
> June 6, 2012, which were recorded by law enforcement and their Agent while
> located within the State of California, and Det. Parmertor's telephone
> conversation with Defendant on June 6, 2012.
>
> 4.  All evidence seized as a result of the search and seizure of Defendant's cell
> phones/computers/electronic media contents and/or contents of any wire or
> electronic communication to the "subscriber" and/or these devices on November
> 20, 2012, or pursuant to search warrants issued on or about that date.

ECF Doc. 7-1 at 192-93.

Knoefel's nine-day trial began on May 29, 2014.  ECF Doc. 7-1 at 13, 194; *see also* ECF

Doc. 8-5; ECF Doc. 8-6; ECF Doc. 8-7; ECF Doc. 8-8; ECF Doc. 8-9; ECF Doc. 8-10; ECF

Doc. 8-11; ECF Doc. 8-12; ECF Doc. 8-13.  At trial, the prosecution presented numerous

witnesses, including David Strunk.  ECF Doc. 8-8 at 198-310.  In relevant part, Knoefel objected

to Strunk's testimony that Knoefel had told him he was arguing with Lisa after she had raised

concerns that he "was messing around with Sabrina."  ECF Doc. 8-8 at 225-30.  Knoefel

specifically objected:

> COUNSEL:  What Lisa said –
>
> COURT:  Here, your client said it to him.  It's not Lisa.  These are words that came
> out {of} your client's mouth, there is nothing you can say about it.
>
> COUNSEL:  Your Honor, it's double hearsay, he is repeating what Lisa said
> allegedly.
>
> COURT:  Your client either said it or didn't say it.

---

[4] Knoefel's motion to suppress does not appear in the state court record that was filed with the Return of
Writ.  *See generally* ECF Doc. 7-1; ECF Doc. 7-2.

COUNSEL:  He's saying that Lisa said.  That's exactly {what} he said.

* * *

COUNSEL:  Lisa's dead, what Lisa said –

COURT:  Establish the fact that they were the only two people in the car, Kevin and your client and establish the fact that he asked that, your client said the words, that's confusing on the record here.

COUNSEL:  I'm not confused, I'm concerned about double hearsay.

PROSECUTION:  That's not your objection.

COURT:  It's not.  Overruled.

ECF Doc. 8-8 at 227-29.

On June 11, 2014, the jury returned a unanimous verdict finding Knoefel guilty of all counts.  ECF Doc. 7-1 at 13-14.  The court accepted the jury's verdict, revoked Knoefel's bond, ordered a pre-sentence investigation and victim impact statement, and deferred sentencing for a later date.  ECF Doc. 7-1 at 14.

On June 25, 2014, Knoefel filed a motion for a new trial under Ohio Crim. R. 33.  ECF Doc. 7-1 at 15.  Knoefel argued that a new trial was necessary because the state trial court erred by: (1) denying presentation of expert testimony from medical information witnesses Steven Neuhaus, Morris Levinsohn, and Pamela Marcum; (2) denying access to and presentation of Zunich's historical, behavioral, medical, and other records from Lake County Job and Family Services, Lake County Juvenile Court, Signature Health, Crossroads, Christian Children's Home, Caley Home, Children and Family First Council, and Morris Levinsohn, MD.  ECF Doc. 7-1 at 16-17.  Knoefel asserted that such evidence would have permitted the jury to better determine Zunich's true reasons for murdering Lisa.  ECF Doc. 7-1 at 17.  And Knoefel contended that the improper exclusion of this evidence placed him in an "impossible position."  ECF Doc. 7-1 at 18.

4

Knoefel also argued that the court improperly permitted the prosecution to use and present: (1) telephone calls between himself and Autumn Pavlik, recorded in violation of California wiretap laws; (2) video and audio recordings between Pavlik and himself in his driveway, obtained in violation of the Fourth Amendment and *United States v. Jones*, 132 S. Ct. 945 (2012); (3) text messages between Lisa and himself, extracted from cell phones in violation of the Fourth Amendment, *Riley v. California*, 573 U.S. 373 (2014) (consolidated with *U.S. v. Wurie*), and the Confrontation Clause of the Sixth Amendment as described in *Crawford v. Washington*, 541 U.S. 36 (2004); and (4) hearsay and speculative testimony from various witnesses describing his reactions or emotional state in violation of Ohio Evid. R. 701, 801-805. ECF Doc. 7-1 at 18-19.  Knoefel further argued that the state had presented insufficient evidence to support a finding of guilt on any of the charges.  ECF Doc. 7-1 at 19-20.  The state trial court denied Knoefel's motion.  ECF Doc. 7-1 at 35.

On August 6, 2014, the state trial court found that Counts 7, 8, 10, and 11 merged with Count 9 and that Count 9 was subject to a mandatory prison term under Ohio Rev. Code § 2929.13(F).  ECF Doc. 7-1 at 39; ECF Doc. 8-14.  The state trial court sentenced Knoefel to 2-year consecutive prison terms for each of Counts 1-6.  ECF Doc. 7-1 at 39; ECF Doc. 8-14.  The court also sentenced Knoefel to a mandatory term of life imprisonment with parole eligibility after 30 years for Count 9, to be served consecutively to the twelve-year aggregate sentenced imposed for Counts 1-6.  ECF Doc. 7-1 at 39; ECF Doc. 8-14.  The state trial court also ordered Knoefel to pay all costs and declared him a Tier III Sex Offender with registration requirements under Ohio Rev. Code §§ 2901.07, 2929.13(H), and 2950.04.  ECF Doc. 7-1 at 40; ECF Doc. 8-14.

**B.    Direct Appeal, Case No. 2014-L-088**

On August 29, 2014, Knoefel appealed to the Ohio Court of Appeals.  ECF Doc. 7-1 at 42.  Knoefel, through new counsel on appeal, raised seven assignments of error:

> 1.  The trial court erred in finding that the calls made and recorded by Detective Ron Parmertor and Autumn Pavlik while located in the State of California did not violate Mr. Knoefel's Fourth Amendment Rights.
>
> 2.  The trial court erred when it admitted the hearsay statement of Lisa Knoefel through the testimony of David Strunk.
>
> 3.  The trial court erred by denying Mr. Knoefel's Motion to Suppress text messages retrieved pursuant to a search warrant obtained without probable cause and by admitting these text messages as evidence at trial.
>
> 4.  The jury erred in finding Mr. Knoefel guilty as to count three of the indictment as the State failed to present legally sufficient evidence to sustain a conviction.
>
> 5.  The jury erred in finding Mr. Knoefel guilty as to all counts of the indictment as such findings were against the manifest weight of the evidence.
>
> 6.  Mr. Knoefel's trial counsel provided ineffective assistance.
>
> 7.  Cumulative error materially prejudiced Mr. Knoefel such that he did not receive a fair trial.

ECF Doc. 7-1 at 69-73, 79-108; *see also* ECF Doc. 7-1 at 171-77.  In his second assignment of error, Knoefel specifically argued that: (1) Strunk's testimony regarding what Knoefel said Lisa said was double hearsay; (2) it did not fall within one of the exceptions permitting admission of hearsay under the Ohio Rules of Evidence; and (3) the nested hearsay (indicating that a sexual relationship existed between Knoefel and Zunich) contributed to his conviction.  ECF Doc. 7-1 at 86-87.  In his sixth assignment of error, Knoefel argued that counsel's performance was constitutionally ineffective because: (1) he failed to review discovery, he objected to his own question, and he failed to call "Dr. Stanisfer" as a witness; and (2) "{a}ll of these instances prejudiced {him} as it undermined confidence in the outcome of the trial."  ECF Doc. 7-1 at 107.  Knoefel did not, however, explain: (1) what discovery counsel failed to review or how any

unreviewed documents might have supported his defense; (2) what question counsel objected to or how such an objection affected his defense; or (3) what Dr. Stanisfer might have said had she been called to testify.  *See generally* ECF Doc. 7-1 at 107.  Instead, Knoefel provided only the following, unexplained citations: (1) "T.p. Vol. V, p. 26-41; Vol. IV, p. 350"; (2) "T.p. Vol. IX, p. 1492-93"; (3) "T.p. Vol. XIII, p. 2484."  ECF Doc. 7-1 at 107.

On December 14, 2015, the Ohio Court of Appeals determined that each of Knoefel's assignments of error was meritless and affirmed his convictions.  ECF Doc. 7-1 at 190-23; *State v. Knoefel*, 2015-Ohio-5207 (Ohio App. Ct., Dec. 14, 2015).  In denying relief on Knoefel's second assignment of error, the court determined that: (1) Strunk's testimony was not hearsay because it was, "strictly speaking, . . probative of whether Lisa suspected {Knoefel} and Zunich of having an affair, rather than of whether {Knoefel} and Zunich were actually having an affair"; (2) even if not hearsay, its probative value was likely outweighed by the danger of unfair prejudice because it could "bolster the State's case that they were, in fact, engaged in a sexual relationship"; and (3) any error in admitting the testimony was harmless.  ECF Doc. 7-1 at 218-19.  The court specifically explained:

> Assuming, arguendo, that Strunk's testimony regarding Lisa's statement should have been excluded, we find the error harmless beyond a reasonable doubt.  That Lisa was disturbed by the nature of Kevin and Zunich's relationship was demonstrated by other evidence in the case.  Zunich testified to Lisa's distrust of her relationship with Kevin.  Zunich's testimony was corroborated by the evidence of text messages retrieved from Lisa's iPhone.  See the following texts sent from Lisa to Kevin: "Cut the damn.  Cord spending too much time with her and less with your real family thanks a lot" (sent 11/10/2012); "Why is it U never think about doing things with me I always last when I should be first" (sent 11/7/2012); "Did u call and just want to speak to Bri {Zunich}" (sent 10/9/2012); "I don't know if I am being funny.  But it seemed more interested in what is going on with Bri than what actually happened to me today" (sent 10/3/2012).

ECF Doc. 7-1 at 218-19 (citations omitted).  In denying relief on Knoefel's fifth assignment of error, the court stated:

The instances of purportedly ineffective assistance cited by Kevin do not demonstrate that trial counsel's performance was deficient or prejudicial to Kevin's interests.

* * *

With respect to trial counsel objecting to his own question, it should be noted that the witness (Zunich) was responding with hearsay, "when I first got there he told me that the only reason –." In any event, the decision to retract a question in the course of a nine-day trial is not remarkable.

Finally, trial counsel's decision not to call Zunich's treating psychologist at the time of the murder, in the absence of any indication as to how her testimony would have benefited Kevin, cannot be deemed ineffective. The trial court had made it clear during the course of the trial that questions regarding Zunich's psychological health would be limited and evidence of her current diagnoses, bipolar, ADHD, and PTSD, were already in evidence. There was also evidence from other witnesses that Zunich's psychological conditions were under control. Trial counsel could have reasonably concluded that further testimony that Zunich's conduct was not the result of psychological illness would not have bolstered the defense case that she killed Lisa on her own initiative.

ECF Doc. 7-1 at 231-32.

### C.     Appeal to the Ohio Supreme Court, Case No. 2016-0138

On January 28, 2016, Knoefel, through appellate counsel, filed an appeal to the Ohio

Supreme Court. ECF Doc. 7-1 at 235-36. In his memorandum in support of jurisdiction,

Knoefel raised five propositions of law:

1.  Evidence illegally obtained in another State is not admissible in Ohio

2.  It is a violation of the Confrontation Clause for a witness's testimony to include a statement made by a defendant, when that statement contains the hearsay statement of a third party

3.  Appellant's rights were violated when text messages were seized pursuant to a warrant lacking in probable cause, and admitted as evidence at trial

4.  Appellant's conviction of count three in the indictment was not supported by legally sufficient evidence

5.  Appellant's trial counsel provided ineffective assistance

ECF Doc. 7-1 at 239, 242-53.  In his second proposition of law, Knoefel argued that: (1) Lisa's statement within Strunk's testimony was inadmissible hearsay under Ohio law because it was used for more than merely showing Lisa's state of mind regarding her marriage; and (2) that hearsay statement contributed to his conviction.[5]  ECF Doc. 7-1 at 245-46.  Knoefel's fifth proposition of law replicated the ineffective-assistance argument he presented in the sixth assignment of error of his brief on appeal to the Ohio Court of Appeals.  *Compare* ECF Doc. 7-1 at 251-52, *with* ECF Doc. 7-1 at 107; *see also* Section I.B n.4, above.  On May 4, 2016, the Ohio Supreme Court declined jurisdiction.  ECF Doc. 7-1 at 316.

On May 13, 2016, Knoefel, through counsel, filed a motion for reconsideration in the Ohio Supreme Court.  ECF Doc. 7-1 at 317-23.  Among recitations of the claims raised in his memorandum of jurisdiction, Knoefel's motion – for the first time in the text outside of headings – addressed the constitutional aspect of his hearsay claim.  ECF Doc. 7-1 at 319.  Specifically, Knoefel argued:

> Rules {of evidence} are in place to protect the integrity of the judicial system by ensuring only relevant, credible, and constitutionally admissible evidence is admitted against a defendant.  Once that system begins to break down allowing testimony to be admitted in violation of those rules, defendants in the Eleventh District {of Ohio} and beyond can no longer presume that only proper evidence will be used against them.
>
> * * *
>
> WHEREFORE, in the interest of justice and to prevent establishing bad precedent as it relates to . . . violations of the Confrontation clause . . . Appellant prays that this Honorable Court reconsider its decision to refuse to accept Appellant's jurisdictional appeal.

---

[5] Notwithstanding the heading for this proposition of law, the body text of Knoefel's brief *did not* include any argument explaining how the admission of this testimony violated his confrontation rights.  *See* ECF Doc. 7-1 at 245-46.  And it *did not* include any reference or citation to decisions by the U.S. Supreme Court explaining the scope of the confrontation clause.  *See* ECF Doc. 7-1 at 245-46.

ECF Doc. 7-1 at 319-20, 322.  On June 29, 2016, the Ohio Supreme Court denied Knoefel's

motion for reconsideration.  ECF Doc. 7-1 at 328.

      Knoefel did not appeal the U.S. Supreme Court.  *See* Docket for Ohio S. Ct. Case

No. 2016-138.

      **D.**     **Post-Conviction Proceedings, Case No. 13-CR-558**

      On January 28, 2016, Knoefel, through the same counsel who represented him on direct

appeal, filed a motion for post-conviction relief pursuant to Ohio Rev. Code § 2953.21.  ECF

Doc. 7-1 at 329-39.  Knoefel raised the following paraphrased claims:

> 1.  He was deprived of his right to effective assistance of counsel under the Sixth
> and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 10
> and 16 of the Ohio Constitution when: (a) counsel refused to allow him to testify;
> (b) counsel neglected to interview and prepare witnesses for trial; (c) counsel
> failed to call Dr. Stanisfer, Joseph Sutton (Knoefel's brother-in-law), and "others"
> as witnesses; (d) counsel represented him despite having "very little felony level
> trial experience, and that inexperience prejudiced {him}"; and (f) counsel failed
> to conduct adequate discovery to uncover evidence refuting the state's narrative
> that Zunich knew of $750,000.00 in insurance proceeds before the murder, that
> insurance money motivated Knoefel to plan Lisa's murder, and that he acted in a
> bizarre, strange, or aberrant fashion for a grieving husband.
>
> 3.  A new witness (James Amacher) was identified who would be "willing to
> testify that Sabrina Zunich has expressly, and repeatedly, stated that Kevin
> Knoefel was not involved with the planning, discussion, or execution of the
> murder in this matter {and} that Sabrina Zunich created her story about the events
> leading up to the murder based on media reports, repeated interviews on the
> subject matter, and the discovery that she could obtain a significant reduction if
> she cooperated.

ECF Doc. 7-1 at 329-39, 519 (supplemental motion), 523-34 (amended motion).

      On March 31, 2017, Knoefel filed a motion for a new trial under Ohio Crim. R. 33.  ECF

Doc. 7-1 at 811-18.  In his motion, Knoefel noted – for the first time – that, on March 24, 2017,

he had received from the prosecutor's office on a December 14, 2014 recording of an interview

between Kari Saunders (Zunich's jailhouse paramour), Captain Ron Walters, and Detective

Robert Izzo.  ECF Doc. 7-1 at 813.  Saunders indicated that Zunich told her she fabricated the story about Knoefel and she had actually planned Lisa's murder with Autumn Pavlik and Edward Lanning.  ECF Doc. 7-1 at 813-14.  Knoefel argued in his motion (and in his supplemental motions and reply) that the new evidence entitled him to a new trial under Ohio Crim. R. 33. ECF Doc. 7-1 at 811-18, 823-36, 847-50; ECF Doc. 7-2 at 618-14.

On May 19, 2017, Knoefel filed a supplemental post-conviction motion in which he also raised the issue of Saunders's interview recording.  ECF Doc. 7-1 at 712-17.  Knoefel included in his argument a conclusory statement that he was "denied his constitutional rights as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution," but did not further elaborate on what his constitutional claim was.  ECF Doc. 7-1 at 712-17; see also ECF Doc. 7-2 at 600-10 (reply in support).  In a July 6, 2017, supplement to his post-conviction motion, Knoefel said that "Brady implications exist" if the state failed to disclose certain interviews between Zunich and the prosecution that were conducted in May and June 2014.  ECF Doc. 7-1 at 730.

On October 27, 2017, the state trial court denied Knoefel's post-conviction motions and motions for a new trial.  ECF Doc. 7-2 at 628-39.  In denying Knoefel's motion for a new trial, the court noted that Knoefel's "new evidence" was cumulative to the impeachment evidence presented at trial and, thus, insufficient to warrant a new trial.  ECF Doc. 7-2 at 630-32.  The court noted that Knoefel's post-conviction motion did not allege a specific constitutional violation concerning Saunders's interview (and affidavits from Megan Boyer and Amacher). ECF Doc. 7-2 at 637-38.  The court also noted that Knoefel likely could not articulate such a violation when Saunders had not come forward until after he was tried and convicted, and there was no indication that the state had any knowledge of Saunders's potential testimony before he

11

was tried and convicted.  ECF Doc. 7-2 at 638.  The court also determined that Knoefel's

ineffective-assistance claims were barred under Ohio's *res judicata* rule because he could have

raised them on direct appeal or *did* (with respect to Dr. Stanisfer) raise them on direct appeal.

ECF Doc. 7-2 at 634-36.  The court explained that: (1) the fact that Defendant, Dr. Stanisfer, and

Sutton did not testify was apparent from the trial record; (2) the fact that trial witnesses'

testimony did not include the substance he said counsel ineffectively failed to elicit was apparent

from the trial record; (3) the only discovery that Knoefel identified counsel failed to seek was

medical records from Dr. Stanisfer, which he raised on direct appeal; (4) he was represented by

new counsel on direct appeal; and (5) all the evidence upon which he relied existed or was

available at trial.  ECF Doc. 7-2 at 634-36.  The court also explained that, even if not *res judicata*

barred, Knoefel's ineffective-assistance claims would fail on the merits because: (1) he did not

submit any information as to what the omitted witnesses might have said if they were called to

testify; (2) Knoefel did not identify what would information was not obtained from the only

witness identified whom counsel was alleged to ineffectively interviewed (Krisanne Sutton); (3)

Knoefel did not point to any evidence that might have been discovered to show the impossibility

of Zunich's knowledge regarding insurance proceeds or other parts of the state's narrative; and

(4) counsel's disputed inexperience is not a basis for post-conviction relief.  ECF Doc. 7-2 at

634-36.

### E.      Post-Conviction Direct Appeal, Case No. 2017-L-150

On November 15, 2017, Knoefel, through counsel, appealed to the Ohio Court of

Appeals.  ECF Doc. 7-2 at 640.  In his appellate brief, Knoefel raised three assignments of error:

> 1. The trial court's denial of Defendant's Motion to Disqualify was an abuse of
> discretion.

12

2. The trial court's denial of Defendant's Motion for a New Trial pursuant to Crim. R. 33 without hearing was an abuse of discretion.

3. The trial court's denial of Defendant's Motion for Post{-}Conviction Relief pursuant to R.C. 2953.21 without hearing was an abuse of discretion.

ECF Doc. 7-2 at 670-700.  With respect to his third assignment of error, Knoefel argued that the trial court abused its discretion when it determined that his ineffective-assistance-of-counsel claims were *res judicata* barred.  ECF Doc. 7-2 at 694-700. Knoefel asserted that it was "impossible to argue on direct appeal that trial counsel was ineffective for properly calling Officer Sutton, Carrie Ward, Dr. Eden, Linda Cover, Kris Sutton, and Kevin Knoefel himself without properly supplementing the record," and that all his claims relied on evidence outside the trial record.  ECF Doc. 7-2 at 695.  Knoefel also argued that the trial court's conclusion that he had not presented sufficient evidence to support his post-conviction motion was improper because he would have produced such evidence had the court held an evidentiary hearing or allowed him to conduct discovery.  ECF Doc. 7-2 at 695-96.  Knoefel also contended that "the disadvantage {he} suffered was most apparent in his inability to compel a justification from the State as to its failure to disclose the existence of the Saunders' interview for more than two years."  ECF Doc. 7-2 at 696.  Further, Knoefel asserted that the court improperly rejected the affidavit of an attorney-expert, which he believed was evidence that counsel's alleged errors (including the refusal to call him as a witness) amounted to ineffective assistance.  ECF Doc. 7-2 at 697-99.  On March 14, 2018, Knoefel filed a reply brief, in which he raised – for the first time – an argument that the state's failure to disclose Saunders's interview recording for two years violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Bagley*, 473 U.S. 667 (1985).  ECF Doc. 7-2 at 753-54.

On January 28, 2019, the Ohio Court of Appeals affirmed the denial of Knoefel's motions for new trial and motions for post-conviction relief.  ECF Doc. 7-2 at 770-88.  The court held that the trial court properly determined that Knoefel's ineffective-assistance argument regarding Dr. Stanisfer's testimony and records was *res judicata* barred, but improperly determined that Knoefel's other ineffective-assistance claims were *res judicata* barred.  ECF Doc. 7-2 at 785-86 & n.4.  Nevertheless, the Ohio Court of Appeals agreed with the trial court that Knoefel failed to establish grounds for relief because he did not point to operative facts that counsel's alleged failures prejudiced him.  ECF Doc. 7-2 at 786-88.  In relevant part, the court explained:

> Ward testified at trial regarding the distress Zunich's presence in the Knoefel's home was causing, particular with regard for Lisa's children.  Ward did not submit an affidavit although Attorney {Robert} Koblentz'{s} report suggests that Ward warned Lisa about Zunich and that she did not believe Knoefel and Zunich were having a sexual relationship. . . .
>
> We agree with the trial court that the claims raised with respect to these witnesses fail to demonstrate substantive grounds for relief.  Even accepting Attorney Koblentz'{s} report as evidence of how the witnesses could have testified, the suggested evidence would have been consistent with, if not cumulative to, the evidence presented at trial.  Several witnesses (mandatory reporters) testified that they did not suspect a sexual relationship between Knoefel and Zunich . . . and Zunich testified that she was fully aware that Lisa wanted her out of the home.

ECF Doc. 7-2 at 787-88.  The court also stated that "Knoefel raise{d} additional arguments . . . , such as the State's delay in turning over the video of the Saunders interview to defense counsel . . .  As with Knoefel's other arguments, these arguments are not supported by credible instances of resulting prejudice."  ECF Doc. 7-2 at 788.

On February 5, 2019, Knoefel filed an application for reconsideration and *en banc* consideration under Ohio App. R. 26(A)(1) and (2).  ECF Doc. 7-2 at 792-96.  On March 5,

2019, the Ohio Court of Appeals denied Knoefel's application.  ECF Doc. 7-2 at 805-09.  In

doing so, the court specifically stated:

> The substance and nature of Knoefel's newly discovered evidence was fully
> considered by this court in its opinion.  That Zunich lied is undisputed.  The issue
> for the jury was whether there was any truth to her statements, either the initial
> statements to the police or her testimony at trial or some combination thereof.  At
> trial, Zunich acknowledged that she received sentencing consideration in
> exchange for her testimony, that she resented what she perceived as Knoefel's
> abandonment of her, and that she had multiple reasons for wanting to murder Lisa
> Knoefel.  The possibility that Zunich was falsely implicating Knoefel in Lisa's
> murder was a constant consideration during her testimony.  Evidence regarding
> her motivations, desires, and intents to do so was before the jury.  As noted in this
> court's opinion, Knoefel's newly discovered evidence essentially impeaches
> evidence already in the record without creating a strong probability of a different
> result if the new trial were granted.
>
> * * *
>
> In the present case, the lower court applied res judicata to Knoefel's claims of
> ineffective assistance of counsel in his petition for postconviction relief.
> Consistent with *Hull*, this court found that it was improper to apply res judicata
> to ineffective assistance claims where evidence of the claims was not part of the
> record on direct appeal.  We nevertheless affirmed the denial of the petition on
> account of Knoefel's failure to make a demonstration of prejudice.

ECF Doc. 7-2 at 806-07, 809 (citations omitted).

### F.     Post-Conviction Appeal to Ohio Supreme Court, Case No. 2019-0549

On April 19, 2019, Knoefel, through counsel, appealed to the Ohio Supreme Court.  ECF

Doc. 7-2 at 810-11.  In his memorandum in support of jurisdiction, Knoefel raised two

propositions of law:

> 1. Newly discovered direct evidence of a co-defendant's false testimony is not
> merely cumulative impeachment evidence of an admitted liar, but is, rather, direct
> evidence of guilt or innocence which materially affects substantial rights and
> therefore warrants a new trial.
>
> 2. It is an abuse of discretion to dismiss where material evidence outside of the
> appellate record has been produced to establish substantive grounds for relief and
> demonstrating gross violations of a defendant's constitutional rights.

ECF Doc. 7-2 at 814, 820-29.  Knoefel's arguments regarding new evidence focused on whether he was entitled to a new trial under Ohio Crim. R. 33 and Ohio law.  ECF Doc. 7-2 at 820-24. And he did not raise any claim that the prosecution withheld exculpatory evidence in violation of his federal constitutional rights or provide any citation to *Brady* or *Bagley*.  ECF Doc. 7-2 at 820-29.  On July 10, 2019, the Ohio Supreme Court declined jurisdiction over Knoefel's appeal. ECF Doc. 7-2 at 870.

## II. Federal Habeas Petition

On July 10, 2020, Knoefel, through counsel, filed a petition for writ of habeas corpus. ECF Doc. 1.  Knoefel's petition raises four grounds for relief:

GROUND ONE: Ineffective Assistance of Counsel

GROUND TWO: Violation of Confrontation Clause

GROUND THREE: Favorable evidence withheld by the state denied petitioner due process in violation of his Constitutional rights and firmly established Supreme Court of the United States precedent

GROUND FOUR: Error in barring Petitioner's claim on the basis of res judicata

ECF Doc. 1 at 6, 8-9, 11; *see also* ECF Doc. 1-1 at 2-12.

## III. Facts

Analysis of Knoefel's petition begins with the facts recited in the Ohio Court of Appeals' opinions.  These factual findings are presumed correct unless Knoefel rebuts them with clear and convincing evidence.  28 U.S.C. § 2554(e)(1); *Wiggins*, 539 U.S. at 528-29; *Burt*, 571 U.S. at 18. In its December 14, 2015, decision, the Ohio Court of Appeals made the following findings of fact relevant to Knoefel's petition:

{¶8}  Theresa Ann Mann, attendance secretary for South High School in the Willoughby-Eastlake City School District, testified that, on November 14, 2012, Zunich signed herself out for early release at 8:54 and signed herself back in at 9:05.

16

{¶9}  Ken Melvin, an intervention specialist (special education teacher) at South High School and a part-time police officer for the City of Willoughby, was Zunich's instructor in the fall of 2012.  Melvin described Zunich as a "B" student without behavioral issues. On November 14, Melvin observed Kevin and Zunich speaking to each other on a low wall outside the school building, noting that it was unusual for a parent to meet with a student in such circumstances during the school day. Later, Kevin approached Zunich inside the building to speak with her. Melvin advised Kevin that he would have to sign in at the school office, which Kevin did.

{¶10}  Ashley Onion, a dispatcher with the Willoughby Hills Police Department, testified that at about 1:15 a.m. on November 16, 2012, she received a 911 call from 2518 Chagrin Drive.  A recording of the call was played for the jury.  Onion further testified that she received a call from Kevin, "inquiring about his girls."  He was advised that they could be picked up from the police department and he did so at about 5:00 a.m.

{¶11}  Patrolman Randolph Mullenax of the Willoughby Hills Police Department testified that at 1:17 a.m. on November 16, 2012, he received a dispatch about an assault in progress at 2518 Chagrin Drive.  At the scene, Mullenax apprehended Zunich and discovered the body of Lisa Knoefel.  The murder weapon was a fifteen-inch (nine-inch blade) convex, serrated knife, without a hilt.

{¶12}  Patrolman Mullenax met Kevin later that morning in the station lobby.  He described Kevin's demeanor as "relatively calm": Kevin "gave me a strange preface saying that he was some kind of EMT before and he had seen stuff like this numerous times and I wasn't going to tell him anything that he hasn't seen before and he wanted to know every detail about what happened."

{¶13}  Officer Michael Sevel of the Waite Hill Police Department at the time of the murder testified that he responded to the dispatch to 2518 Chagrin Drive on the morning of November 16, 2012.  Sevel noted that the pants Zunich was wearing that night had tears in them.

{¶14}  Steve Lucic, a fireman and paramedic for the City of Willoughby Hills, was on the scene on November 16, 2012.  Lucic testified that, upon arrival, Lisa Knoefel's EKG was asystole (or flatline) and that paramedics were unable to run an IV because her veins had collapsed as a result of blood loss.

{¶15}  Tom Smith, a firefighter paramedic with the Kirtland Fire Department, treated Zunich on the night of the murder.  Zunich had various minor lacerations on her hands, the back of her neck, and on her legs above the knees.  When Smith first received custody of Zunich from the police she was hyperventilating.  She ignored most of the questions Smith asked her.  Thereafter, she was exhausted and dozing off.

17

{¶16}  Dr. Joseph Andrew Felo, a forensic pathologist with the Cuyahoga County Medical Examiner's Office, supervised the autopsy of Lisa Knoefel (age 41) on behalf of the Lake County Coroner's Office.  Dr. Felo identified a lethal injury on her mandible (jaw) area, which penetrated deep enough to sever the carotid artery leading to the brain.  There was another lethal wound in her breast that penetrated to and collapsed the lung underneath.  Several of the cuts were described as complex, meaning "that either the knife or the instrument was twisting and/or the person receiving those are twisting."  There were numerous defensive injuries on both her hands and legs.  Lisa Knoefel's wounds were consistent with the types of wounds which the knife recovered at the scene would cause.  Dr. Felo opined the cause of death was "multiple stab and incised wounds, at least 178 in total, of head and neck, torso and extremities with musculoskeletal, vascular and visceral injuries."

{¶17}  Erica Gaiter supervised Lisa Knoefel as a social worker in the ongoing sex abuse department for Cuyahoga County Division of Job and Family Services and interacted with her on a daily basis.  Gaiter testified that Lisa appeared distracted – "trying to stay focused" – in the weeks prior to her murder.

{¶18}  The day after the murder (Saturday, November 17), Gaiter took food to Kevin's mother's house.  Gaiter noted that Kevin's demeanor appeared "normal," that he was neither sorrowful nor upset.  Gaiter also noted a picture of Zunich on the refrigerator.  Gaiter described Kevin's demeanor at Lisa's funeral as "emotionless."

{¶19}  Kayleen Lessmenn worked with Lisa Knoefel for thirteen years as a sex abuse social worker at Cuyahoga Children and Family Services.  Lessmenn testified that, during the course of 2012, Lisa would more often step away from her desk to take private calls, which were sometimes upsetting to her.  The day after the murder, Lessmenn was speaking with Kevin Knoefel and he made the comment, in a "matter of fact" way, that $50,000 (Lisa's salary) would be "a lot to make up."

{¶20}  Pamela Brown, a social worker with Cuyahoga Children and Family Services and branch president of the AFSCME (public employee trade union), testified that, on the morning of November 16, 2012, she received a call from Kevin inquiring as to what paperwork was necessary to make a claim on Lisa's life insurance policy with the union.  Brown testified that the value of the policy was $30,000 or $35,000, depending on the employee's classification.

{¶21}  Jill Reynolds was a benefits specialist with Gordon Food Services, where Kevin Knoefel worked as a transit driver.  On November 16, 2012, she received a call from Kevin, advising that his wife had died and that he wanted to file an insurance claim.  Reynolds asked about the cause of death, since there was accidental death and dismemberment coverage.  Kevin replied that he did not

know.  Gordon Food Service provided $10,000 of basic life coverage for Lisa and Kevin had purchased $60,000 in supplemental life.  The amount of accidental death and dismemberment coverage matched the value of the life policies. Reynolds sent Kevin the paperwork necessary to file a claim and it was returned on November 23, 2012.

{¶22}  Deborah Amiott Jordan, a team and group leader of Gordon Food Services' insurer, Hartford Insurance Company, processed Kevin's claim. Hartford issued three checks to pay the claim: one to Kevin for $70,000; another to Kevin for $63,332; and a third to Davis-Babcock Funeral Home for $6,682.77.

{¶23}  Diana Fields, a senior claims examiner with American General Life, testified that on November 16, 2012, Kevin reported a claim on a $250,000 life policy insuring Lisa Knoefel.  The policy was issued on May 16, 2012.  Hartford paid $251,685.10 on Kevin's claim.

{¶24}  Christopher Eddy, a team leader for Guardian Life Insurance Company, testified that Guardian Life provides insurance for Cuyahoga Children and Family Services through a self-administered group life policy.  Guardian Life issued a check to Kevin for $249,542.34 in payment for Kevin's claim.

{¶25}  Donna Castiglione, an assistant director of member services with the Ohio Public Employee Retirement System, testified that, on November 19, 2012, Kevin notified OPERS of Lisa Knoefel's death.

{¶26}  Chuck Fullen, supervisor of survivor benefits for OPERS, testified that Kevin was entitled to a per month benefit of $1,030.51 due to Lisa's membership in OPERS.

{¶27}  Ryan Kenneth Dodge, a customer service representative for the Frank Zingale Insurance Agency, testified that Kevin Knoefel called the agency on November 16, 2012, and requested that claim forms be delivered that day.  The forms were delivered to Kevin's sister, who apologized because Kevin was too distraught to accept them at the moment.

{¶28}  Frank Zingale, an agent for Farmers Insurance, testified that Kevin was paid $150,286.50 on a term life insurance policy purchased in 2009 for Lisa Knoefel.  Zingale testified that, in the months following Lisa's death, Kevin changed the policy on the home at 2518 Chagrin Drive from renters to homeowners insurance and installed a swimming pool.  Kevin also took out automobile insurance on a 2013 Cruze, a 2011 Malibu, and two campers.

{¶29}  Patrolman Jamie Onion of the Willoughby Hills Police Department testified that on September 15, 2012, he went to 2518 Chagrin Drive in response to a domestic call.  Onion spoke with Kevin at the scene.  Kevin explained that he and his wife, Lisa, had had an argument regarding Megan, Lisa's thirteen-year-old

daughter from a prior marriage.  Kevin had grabbed Megan by the back of the neck and walked her to her room.  Lisa accused Kevin of choking Megan.  Although the dispute was over and Lisa was no longer at the residence, Kevin wanted the incident documented because it could lead to divorce and affect his custody of Hailey, his three-year-old daughter with Lisa.

{¶30}  Detective Brian Jackson of the Willoughby Hills Police Department testified that he met Kevin at 2518 Chagrin Drive on November 17, 2012.  Kevin wanted to enter the house and asked the police to ensure there was no media presence.  Jackson discouraged Kevin from entering the house because, although the scene had been released, it had not been cleaned up.  Kevin displayed no emotion and said that he wanted to see it for himself.  Thereupon, Jackson departed.

{¶31}  Nicole Corbett, a social worker for Lake County Department of Job and Family Services is currently a supervisor at the Caley Home.  In the summer of 2010, Corbett became Zunich's ongoing social worker.  Zunich was a resident at the Caley Home for about a year until her placement with the Knoefels, licensed foster parents, in July 2011.  Zunich was eager to leave the Caley Home and be placed with a family.  Zunich initially attended Community Academy for school.  Beginning in the fall of 2012, she began attending South High School as a senior.

{¶32}  In October 2012, Kevin contacted Corbett and advised that he and Lisa were considering divorce and asked if Zunich would be able to remain with him if he and Lisa separated.  Corbett replied that it was a possibility.

{¶33}  On October 26, 2012, Corbett conducted a home visit at the Knoefel household.  Corbett had no concerns regarding Zunich, as she was doing well in school, attending counseling, and passing her drug screens.  Zunich wished to remain in the custody of Lake Job and Family Services and to continue her placement with the Knoefels after her eighteenth birthday (October 27).

{¶34}  Corbett testified that, prior to her placement with the Knoefels, Zunich was residing with her grandmother.  Zunich was removed from the grandmother's home due to the grandmother's age and behavioral issues, such as Zunich stealing money.  At the Caley House, Zunich had psychological (heard voices, anger), substance abuse, and behavioral issues (lying and being manipulative).

{¶35}  Jay Leonard, a corrections officer at the Lake County Jail, testified that, on the morning of November 17, 2012, Kevin came to the jail and asked to visit Zunich.  Leonard advised that Zunich did not have any more available visiting time on that date.  Kevin stated that he needed to see her and appeared anxious.  After waiting a few minutes in the lobby, Kevin returned to the window separating Leonard from visitors and, more anxiously, stated that "he really needed to see or visit her, put his hands down on the table and said you don't

understand, I do need to see her cause I'm her {foster} father." Kevin also arranged to have his name added to Zunich's visitor list.

{¶36}  John Wooley, a general district manager for Chase Bank, testified that, on July 9, 2012, a high school checking account in the names of Sabrina Zunich and Kevin Knoefel was created. Wooley also testified regarding various joint accounts owned by Kevin and Lisa Knoefel and, after Lisa's death, by Kevin and Judith Knoefel (Kevin's mother).

{¶37}  Denise Burris, a benefits coordinator for various Cuyahoga County agencies, testified that Lisa Knoefel first acquired life insurance benefits (the Guardian policy) through the county in March 2012. Lisa applied for the insurance during an open enrollment period in November 2011.

{¶38}  David Strunk testified that he was a "close friend" of Kevin Knoefel for sixteen years.

{¶39}  In October 2012, their families, including Zunich, went on a camping trip to Rocky Fork Ranch Resort in Kimbolton, Ohio. During the trip, Kevin confided in him that he and Lisa were fighting and she believed that he was having an affair with Zunich. Kevin further confided that he was considering seeing a divorce attorney and showed Strunk modeling pictures of Zunich. During the camping trip, Kevin told Strunk that Zunich picked out underwear for him that she thought would be comfortable.

{¶40}  Strunk met and spoke with Kevin on the morning of November 16, 2012, at his mother's house. Kevin was upset and crying, and told him that he had already made arrangements to meet with a funeral home. Kevin asked Strunk to obtain some information regarding a life insurance policy on Lisa. Kevin also asked Strunk to shut down Lisa's Facebook and email accounts, so that he would not have to deal with people leaving messages.

{¶41}  That afternoon, Strunk received the insurance forms delivered to Kevin's mother's house. Strunk then accompanied Kevin to the funeral home. Arrangements were made for Lisa's funeral on Tuesday, November 20, from 5:00 to 7:00 p.m. Later, Kevin discussed going to the jail to visit Zunich "to make sure she was okay and to let her know that he was still there for her and that he hadn't given up on her." Kevin had already contacted the Willoughby Hills Police and asked about Zunich's location and visiting regulations.

{¶42}  The next day (Saturday), Strunk took Kevin to the Lake County Jail. When he was refused admission, Kevin became upset and wanted to know who had visited Zunich before him. Kevin then wrote a note for Zunich, but the note could not be delivered. Leaving the jail, they went to an AT&T store on Mayfield Road to get a new battery for Kevin's phone, and to an AT&T store in Willoughby to deactivate Lisa's and Zunich's phone lines. During the errands, Kevin contacted

Zunich's relatives and asked them to let Zunich know that he was not ready to give up on her and would be there for her.

{¶43}  That afternoon, Kevin arranged to visit the home on 2518 Chagrin Drive to pick up some clothing and to see the room where Lisa was murdered.  Kevin explained he wanted to see the room because it would give him closure and help him move on.  After viewing the bedroom for a few minutes, Kevin stated he wanted to have the house cleaned and Lisa's belongings moved out.  A clean-up crew had substantially cleaned the house on that Saturday and Lisa's belongings were removed on Sunday.

{¶44}  On November 19 (Monday), Strunk asked Kevin if he had any sort of inappropriate relationship with Zunich.  Kevin did not reply to the question and changed the topic of conversation.

{¶45}  Strunk testified that, in December 2012, he was contacted by the police and asked to make a statement.  About that time, Strunk and Kevin became estranged.

{¶46}  Joe Becka testified that, in November 2012, he worked as a field specialist for Rainbow International, which performs remediation services including trauma scene clean up.  On the morning of November 17, he met with Kevin with respect to cleaning the residence at 2518 Chagrin Drive.  Kevin advised that he had a $250,000 life insurance policy and that cost did not matter, but he wanted the home cleaned.  Kevin's manner was "matter of fact."  During the cleaning, Kevin asked Becka to look for a finger and a ring that might be in the bedroom.

{¶47}  Elliott Lambert, a general manager with Rainbow International, assisted Becka in cleaning the Chagrin Drive residence.  Lambert noted Kevin's calmness during their interaction.

{¶48}  Tom Walsh, chief investigator at the Lake County Prosecutor's Office, participated in the post-arrest interview of Kevin Knoefel on August 9, 2013.  A DVD of the interview was played for the jury.

{¶49}  Sabrina Zunich testified that, in August 2013, she entered into a cooperation agreement with the State of Ohio, whereby, in exchange for her testimony against Kevin, she would be allowed to plead to Aggravated Murder and the State would recommend a sentence of life with eligibility for parole after thirty years.

{¶50}  When placed in the Knoefels' home, Zunich was taking nine different medications for bipolar disorder, ADHD, and insomnia.  Although she was subject to fluctuating mood swings, these were controlled while in the Knoefels' home.  For a period of about one month at the Caley Home, Zunich heard voices as a side-effect of medicines she was taking at the time.

{¶51}  Zunich testified that she interacted better with Kevin Knoefel, than with Lisa, who made her feel like an outsider and was less approachable.  Zunich was interested in possibly becoming a massotherapist and Kevin, being a truck driver, would complain about pain in his thighs.  On Kevin's suggestion, Zunich began the habit of massaging his thighs.  Over a period of a couple of months, she began massaging his genitalia.  This occurred in various rooms of the Chagrin Drive residence.

{¶52}  In early 2012, Zunich went on a camping trip with the Knoefels to North Carolina.  During this trip, Zunich and Kevin began masturbating each other.  After this, Zunich began to have feelings for Kevin as more than just a foster father.  She identified Kevin among the contacts on her iPod as "Kevin love" and bought him underwear.

{¶53}  Throughout the course of 2012, there was increased tension between Zunich and Lisa and Lisa's daughter, Megan. Zunich and Lisa began to argue regularly.  There was an incident where Lisa restrained Zunich physically which resulted in Zunich making a statement to the police.  Zunich had a strong desire to be a mother figure to Hailey, and, shortly before the murder, Lisa took Hailey away from Zunich.

{¶54}  During the summer of 2012, Zunich opened a bank account with Kevin as a cosigner.  Zunich deposited money she made working at a summer job and social security payments she received after her (biological) father died.

{¶55}  Zunich testified that about four months before Lisa's murder, she began having a sexual relationship with Kevin, but could not otherwise identify when that relationship started.  She described the activity from April to August 2012 as "blow jobs and masturbation."  Zunich testified to having vaginal intercourse with Kevin, when she "was 17 or 18" and after she turned eighteen.

{¶56}  In the fall of 2012, Zunich began attending South High School.  Kevin would usually drive Zunich to school in the morning, a ten-minute drive, during which time they would engage in sexual activity ("blow job and fingering").  Zunich recalled a specific instance of sexual activity between her and Kevin when she was hospitalized in September 2012 for appendicitis.  At this time, Kevin and Lisa began to argue more frequently and Lisa expressed her wish that Zunich leave the house.

{¶57}  In September, Kevin confided in Zunich that there were life insurance policies on Lisa worth $750,000 and that she "would be worth more dead than alive."  According to Kevin, if Lisa was gone, they could live together and raise a family.

{¶58}  Zunich described a conversation between herself, Kevin, and a friend from high school, Autumn Pavlik, that occurred in Kevin's car when they were going to a Chinese buffet.  The three discussed having a friend of Pavlik's kill Lisa.  Nothing more occurred in furtherance of this plot.  In October 2012, Pavlik moved to California.

{¶59}  On October 27, 2012, Zunich turned eighteen but elected to continue her placement in the Knoefel home.  Zunich feared that Lisa would force her to leave the home.

{¶60}  At sometime after her birthday, Kevin confided in Zunich that he did not love Lisa anymore, but did not want to get a divorce because he would have to share custody of Hailey (Kevin's three-year-old daughter with Lisa).

{¶61}  In early November, Kevin and Zunich discussed using a pistol to kill Lisa.  Zunich was supposed to use a pistol that could not be traced to Kevin and to wrap a pillow around it to muffle the sound.  She would then hide the gun in the basement where Kevin could retrieve and dispose of it.  In court, Zunich identified the gun Kevin intended her to use.  Kevin intended to take Zunich to a shooting range to practice but it never happened because Lisa wanted to accompany Kevin to the range.

{¶62}  On the morning before the night of the murder, Kevin was driving Zunich to school when he stopped and described a fight he had with Lisa.  Kevin was crying and laid or banged his head on the steering wheel.  He said he "can't stand any more so I'm going to kill myself if she's not dead."  Zunich replied that she would kill Lisa.  Kevin had previously instructed Zunich as to how to kill Lisa: if Lisa was laying on her side, drive the knife between her shoulder blades; if Lisa was laying on her back, stab her in her throat; rotate the knife after stabbing it into her body; attack her at night, after she is asleep but before the time Hailey wakes up and comes in her bed; wear tight clothing that covers your whole body; leave your clothes in a bag outside the garage; make it look like a burglary by emptying out clothes drawers and the jewelry box; and, if you are caught, play insanity or self-defense.

{¶63}  Zunich executed these instructions on the morning of November 16, 2012.  Although she anticipated murdering Lisa with a single stab wound, Lisa fought back.  The commotion awoke Megan who pleaded with Zunich to stop and called the police.  Zunich continued to stab Lisa until she was sure she was dead.  When Zunich heard the police outside the bedroom, she cut herself to make it look like self-defense.  She also claimed to have blacked out and to not remember anything about the attack, as instructed by Kevin.

{¶64}  Following her arrest, Zunich began to feel abandoned by Kevin.  She was resentful because he did not do anything to help her or support her.  In May 2013,

Zunich informed the police of Kevin's involvement in Lisa's murder in order to serve justice: "because I'm not the only one who did this."

{¶65}  Francis Corley, Zunich's maternal aunt, testified that she had concerns about Zunich's relationship with Kevin Knoefel, because they had opened a joint bank account and Zunich had lent him money.  Zunich also revealed knowledge of the life insurance policies on Lisa prior to the murder.  Following the murder, Kevin asked her to tell Zunich that he loved her and was not giving up on her.  In March 2013, Corley asked Kevin directly about his relationship with Zunich.  He responded "something to the effect that his neighbors were asking him questions too," and the subject was changed.

{¶66}  Corley testified that Zunich was placed in the Caley Home because her grandmother could not control her and, for similar reasons, she declined to have Zunich placed in her home.

{¶67}  Willie Smith, a social worker with the Willoughby-Eastlake School District, testified that he had contact with Zunich on a daily basis at Community Academy during the 2011-2012 school year.  Smith recalled an occasion when Kevin Knoefel was at the school to help resolve a dispute between Zunich and some of the other students.  He noted that Zunich sat on his lap between his legs.

{¶68}  For the 2012-2013 school year, Smith's responsibilities included South High School as well.  On one occasion, Smith recalled Zunich being upset because Lisa Knoefel was going to kick her out of the house.  On another occasion, in late October or early November, Smith recalled Zunich saying Kevin was going to divorce Lisa, but that she did not know it yet.

{¶69}  Latasha Stewart, a youth services coordinator for Catholic Charities, supervised Zunich's employment during the summer of 2012.  Stewart met with Zunich on November 9, 2012.  During this meeting, Zunich mentioned that Lisa did not like her relationship with Kevin.  Stewart asked Zunich if there was anything inappropriate about the relationship and Zunich denied that there was.

{¶70}  Melissa Jevack, a probation officer with the Lake County Juvenile Court, was Zunich's probation officer since 2009.  Jevack testified that in July or August 2012 she received a call from Kevin.  He was noticeably agitated because Zunich was dating or wanted to date an older boy.  Kevin asked Jevack to speak with Zunich.  When Jevack spoke to Zunich, she began to cry and said she did not understand why it was a "big deal" because she was almost eighteen.  Jevack advised Zunich that she must abide by Kevin's rules since she was living in his home.  Jevack testified that she did not have difficulties with Zunich during the period of her probation.

{¶71}  Jamie Walsh, a digital evidence examiner with the Lake County Crime Laboratory, searched twenty-two different electronic devices from the Knoefel home but found nothing implicating Kevin in Lisa's murder.

{¶72}  Autumn Pavlik was a friend of Zunich's from school in 2012 until October, when she moved to California.  Pavlik testified about an incident when Kevin was driving her and Zunich to a Chinese buffet and Kevin showed her a gun that he kept in his truck.

{¶73}  Pavlik testified that Zunich told her that Kevin and Lisa fought over the way he would talk to her, Kevin and Lisa were going to get a divorce, and Lisa was worth more dead than alive.  Zunich asked Pavlik if she was able to hire a hit man.  Zunich would bring up the topic of hiring a hit man repeatedly.

{¶74}  About a week before she left for California, Pavlik and Zunich were discussing doing a drug run to get a hit man.  Pavlik, who was not interested in obtaining a hit man, told Zunich she needed a ride to do the run.  Shortly thereafter, Kevin called her and asked if she needed a ride to do the run.

{¶75}  After Lisa's murder, Pavlik cooperated with the police in recording telephone calls to Kevin from California.  Pavlik testified that she attempted to contact Kevin by phone and by text on multiple other occasions, but without response.  On June 4, 2013, Kevin contacted Pavlik by phone.  A recording of the conversation was played for the jury.

{¶76}  On July 10, 2013, Pavlik visited Kevin in Ohio at his home.  The conversation was video-recorded and played for the jury.  During the conversation, Pavlik tells Kevin that the police have been trying to contact her and asks what she should tell them about the hit man and about Zunich and his relationship.  Kevin responds that she should tell them the truth because he does not know what Zunich said to her.

{¶77}  Pavlik testified that when Zunich proposed hiring a hit man to kill Lisa, she pretended to go along with the idea although she had no serious intention of aiding Zunich.  Pavlik also admitted that she did not do anything to dissuade or stop Zunich other than telling her that she did not think killing Lisa was a good idea.

{¶78}  Detective Ron Parmertor of the Willoughby Hills Police Department testified that he responded to the scene at 2518 Chagrin Drive on the morning of November 16, 2012.  Parmertor spoke with Zunich who denied having any recollection of the events of that evening.  He also collected prescriptions for Vyvanse (for ADHD) and Lamotrigine (for bipolar) belonging to Zunich.

{¶79}  Detective Parmertor testified regarding the number of communications (cellular calls and texts) between Kevin, Lisa, and Zunich in the time before the

murder.  Between November 1 and 16, 2012, there were 1,491 communications between Kevin and Zunich, 78 of which occurred between 7:12 p.m. on November 15 and 12:46 a.m. on November 16.  Between November 1 and 16, 2012, there were 201 communications between Kevin and Lisa, and no communications at all between 7:12 p.m. on November 15 and 12:46 a.m. on November 16.  Parmertor conceded that Kevin and Lisa worked conflicting shifts and that his statistics regarding communications between Kevin and Lisa did not include calls made using the house's land line.

{¶80}  Detective Parmertor testified that Zunich first brought to the attention of law enforcement the number of insurance policies on Lisa's life during the proffer negotiations in May 2013.  During the initial interview with Autumn Pavlik in early 2013, Parmertor noted that it was Pavlik who raised the topic of hiring a hit man.

{¶81}  On June 6, 2013, two days after Kevin spoke with Pavlik, Detective Parmertor called Kevin and asked him if he was familiar with certain acquaintances of Zunich.  When he mentioned Pavlik's name, Kevin responded that her last name did not "ring a bell," but he thought Zunich had a friend named Autumn from school who "disappeared."  A recording of Parmertor's conversation with Kevin was played for the jury.

{¶82}  In August 2013, Detective Parmertor executed a search warrant on Kevin's residence.  He noted extensive remodeling since the time of the murder in November 2012.  Parmertor also noted that since the murder, Kevin registered four vehicles: a 2011 Chevy Malibu, a 2013 Chevy Cruze, a 2011 Chevy Silverado, and a 2013 Rockwood travel trailer.  Parmertor conceded that some remodeling was already being done at the time of the murder.

{¶83}  Detective Parmertor acknowledged that Pavlik thought that her recorded conversations with Kevin went "horrible" because she did not get anything out of him.  Parmertor also acknowledged the search of Kevin's residence, including electronics, did not reveal anything illegal or incriminating.

{¶84}  Douglas Rohde, supervisor of chemistry and toxicology at the Lake County Crime Laboratory in Painesville, Ohio, testified to the presence of amphetamines in Zunich's urine.  Rohde further testified that the primary use of Vyvanse is to treat ADHD and that a secondary use of Lamotrigine is for bipolar disorder (the primary use is for seizure disorder).

{¶85}  Doctor Wendy Adams, an assistant laboratory director at NMS Labs in Willow Grove, Pennsylvania, testified that concentrations of Lamotrigine and amphetamine in Zunich's blood were consistent with the normal therapeutic use of her prescription medication.  Dr. Adams was unable, however, to identify the source of the amphetamine.

{¶86}  The following testimony was presented on behalf of Kevin:

{¶87}  Kris Ann Sutton, Kevin's sister, met Kevin at their mother's house early on the morning of November 16, 2012. She described Kevin as crying and emotionally distraught.  Lisa's funeral arrangements were made in consultation and with the consent of the family.

{¶88}  Sutton testified that she did not have concerns about Kevin and Lisa's marriage, but admitted that she had no contact with Kevin and his family for about a year prior to Lisa's murder.

{¶89}  Willow Dennis, a student at South High School, testified that she rode the bus with Zunich.  Dennis recalled Zunich on the bus stated that she hated her mom (Lisa) and that she was going to kill her.

{¶90}  Linda Cover owned the house at 2518 Chagrin Drive that Kevin was renting under a "rent option to purchase" land contract at the time of Lisa's murder.

{¶91}  Carrie Ward, an ongoing social worker with the Cuyahoga County Department of Job and Family Services, knew Lisa and her family socially.  Ward testified that Lisa had concerns about Zunich's interactions with her children. Zunich would fight with Megan and play the role of mother to Hailey.  Lisa was also frustrated in regards to her relationship with Kevin.

ECF Doc. 7-1 at 194-213; *see also State v. Knoefel*, 2015-Ohio-5207 (¶¶8-91).

## IV.  Law and Analysis

To obtain a writ of habeas corpus, Knoefel has the burden to prove that he is "in custody in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a). Additionally, Knoefel must show that each claim he presents meets all the jurisdictional and procedural requirements to obtain merits review by the federal habeas court.  *See*, *e.g.*, 28 U.S.C. § 2254(b) (exhaustion); 28 U.S.C. § 2244(d) (statute of limitations).  I conclude that Knoefel cannot meet his burden to establish a right to federal habeas relief with respect to any of the claims raised in his petition and traverse.

### A.  Ground One: Ineffective Assistance of Counsel

#### 1.  Parties' Arguments

In his Ground One claim, Knoefel argues that trial counsel rendered constitutionally ineffective assistance: (1) by failing to investigate and failing to review and become familiar with discovery provided by the state; (2) by objecting to his own question; and (3) by failing to call Dr. Stanisfer as a witness. ECF Doc. 1 at 6; ECF Doc. 1-1 at 3. Knoefel asserts that trial counsel had a "duty to make reasonable investigations or to make reasonable decision[s] that would render certain investigations unnecessary," but "failed to investigate and interview the numerous witnesses on the State's witness list and failed to call appropriate witnesses at trial." ECF Doc. 1-1 at 4. Specifically, Knoefel contends that counsel's failure to investigate "a statement provided by Carrie Ward" – that she had warned Lisa about Zunich and was aware the Knoefels were in the process of removing her from their home – left counsel unable to effectively *elicit testimony*[6] from her regarding the state's theory that Zunich murdered Lisa out of fear of being removed from the home. ECF Doc. 1-1 at 4. Knoefel also argues that counsel's "lack investigation also obstructed discovery of three additional witnesses who had direct knowledge that Ms. Zunich confessed to falsely accusing Mr. Knoefel after the fact." ECF Doc. 1-1 at 5. Further, Knoefel contends that there was no reasonable explanation for counsel's deficient performance, and he was "prejudiced as confidence in the outcome was severely undermined."

---

[6] The term "elicit testimony" is my characterization of Knoefel's argument. Knoefel's filings actually say that counsel was unable to effectively "cross[-]examine" Ward. ECF Doc. 1-1 at 4; ECF Doc. 9 at 7. But "cross-examination" is "[t]he questioning of a witness at a trial or hearing by the party opposed to the party in whose favor the witness has testified. The purpose of cross-examination is to discredit a witness before the fact-finder . . . ." *Cross-Examination*, BLACK'S LAW DICTIONARY (11th ed. 2019). Ward was a *defense witness*. ECF Doc. 8-11 at 296-97 (trial counsel calling Ward). Trial counsel examined Ward on *direct*, not *cross*. ECF Doc. 8-11 at 297 (trial counsel beginning direct examination); *see Direct Examination*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The first questioning of a witness in a trial or other proceeding, conducted by the party who called the witness to testified. Often shortened to *direct*." (emphasis in original)). And the kind of information Knoefel appears to think counsel should have elicited is *favorable direct testimony*, not information discrediting Ward's testimony. *Cross-Examination*, BLACK'S LAW DICTIONARY (11th ed. 2019). Of course, these are not magic words. It's clear that Knoefel is challenging a failure to *elicit certain testimony* from Ward. The precise phase of examination during which the alleged failure occurred isn't important.

29

ECF Doc. 1-1 at 3-4.  Knoefel also asserts that he raised these issues in his post-conviction petition; that his claims were not "vague, conclusory, or palpably incredible, nor patently frivolous or false"; and that the trial court improperly dismissed his claims without hearing even though he was entitled to one.  ECF Doc. 1-1 at 4-5.

Warden Phillips responds that this court must defer to the Ohio Court of Appeals' reasonable finding that trial counsel's performance was not constitutionally ineffective.  ECF Doc. 7 at 30-36.  Warden Phillips argues that Knoefel has not pointed to any evidence demonstrating that counsel was unprepared or unfamiliar with the trial evidence; and counsel's objection to a witness's answer which provided a hearsay statement was neither deficient nor prejudicial.  ECF Doc. 7 at 33-34.  Warden Phillips asserts that trial counsel made a reasonable tactical decision to not call Dr. Stanisfer as a witness when other evidence in the record established that Zunich's mental conditions were under control and he was not confident that Dr. Stanisfer's testimony would be any different.  ECF Doc. 7 at 34.  Warden Phillips contends that, even if trial counsel was wrong about Dr. Stanisfer's potential testimony and even though the strategy was not ultimately successful, it was still a strategic decision that cannot be second-guessed.  ECF Doc. 7 at 35.

In his traverse, Knoefel generally restates the same arguments presented in his Ground One claim.  *Compare* ECF Doc. 9 at 6-7, *with* ECF Doc. 1-1 at 3-5.  Knoefel also contends that "[e]ven if [his] ineffective assistance of counsel claims fail to meet the double deferential standard of *Strickland* review, [his] claim can still survive if failure to consider it will result in a fundamental miscarriage of justice."  ECF Doc. 9 at 8 (citing *Strickland v. Washington*, 466 U.S.

668 (1984)).  Knoefel concludes that, in light of his arguments, the rial court unreasonably

denied his ineffective-assistance-of-counsel claims without a hearing.  ECF Doc. 9 at 8-9.[7]

## 2.    AEDPA Deference

Because the Ohio Court of Appeals addressed Knoefel's ineffective-assistance-of-counsel

arguments on the merits, Knoefel's Ground One claim is subject to the deferential

reasonableness standard under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.

L. 104-132, 110 Stat. 124 ("AEDPA").  *Mays v. Hines*, No. 20-507, manuscript op. at 6, 592

U.S. ___ (Mar. 29, 2021) (*per curiam*).  Under AEDPA, habeas relief is available only when the

state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Unreasonable" doesn't mean simply "erroneous" or that the petitioner has

"a strong case for relief."  *Mays*, No. 20-507, manuscript op. at 6, 592 U.S. at ___ (citing

*Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)

(AEDPA deference imposes a "substantially higher threshold" than whether a state court

---

[7] In addition to the arguments discussed above, Knoefel's traverse adds to his Ground One claim an argument that the state court unreasonably determined that *res judicata* barred his ineffective-assistance-of-counsel claims in his post-conviction proceedings.  ECF Doc. 9 at 7-8.  He doesn't really flesh out this argument or convincingly explain how it's related to his ineffective assistance claims in Ground One. ECF Doc. 9 at 7-8.  Warden Phillips has not argued that Knoefel's Ground One claim is procedurally defaulted (because it's not).  And the Ohio Court of Appeals *overruled* the state trial court's conclusion that his post-conviction ineffective-assistance claims were *res judicata* barred (with exception to the claims that were fully raised and addressed in his direct appeal).  ECF Doc. 7-2 at 784-88.  But even if the argument actually added anything to Knoefel's Ground One claim (it doesn't), the additional argument would be forfeited.  *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("Because the . . . argument was first presented in [petitioner's] traverse rather than in his habeas petition, it was not properly before the district court, and the district court did not err in declining to address it.").

decision was correct).  It means that the "decision 'was so lacking in justification . . . beyond any possibility for fair minded disagreement'" that it resulted in an "'extreme malfunction{} in the state criminal justice system.'"  *Mays*, No. 20-507, manuscript op. at 6, 592 U.S. at ___ (citing *Harrington*, 562 U.S. at 102-03).

### 3. Ineffective Assistance Standard

The Sixth and Fourteenth Amendments guarantee criminal defendants the right to "reasonably effective assistance" of counsel.  *Strickland*, 466 U.S. at 687.  To obtain relief on an ineffective-assistance theory, the petitioner has to show that: (1) trial counsel's action or inaction was objectively unreasonable in light of all the circumstances of the case; and (2) "the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687-88.  The measure of reasonable performance by counsel is competence, not perfection.  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  To meet the first *Strickland* prong, the petitioner has to overcome the presumption that trial counsel exercised reasonable professional judgment in light of the circumstances that counsel faced when making all significant decisions.  *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").  And for "prejudice," the petitioner has to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694; *see also Smith v. Jago*, 888 F.2d 399, 404 (6th Cir. 1989) ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."), *cert. denied*, 495 U.S. 961 (1990).

The already deferential *Strickland* standard becomes even more difficult to meet when combined with the highly deferential AEDPA standard.  *Harrington*, 562 U.S. at 88.  The

question becomes "not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 89.  If there is, the federal habeas court must leave the state court's decision unmolested.  *See Mays*, No. 20-507, manuscript op. at 6, 592 U.S. at ___ (If there's room for fairminded disagreement, the federal court cannot "intrude on a State's 'sovereign power to punish offenders.'").

### 4.  Analysis

Because the Supreme Court has not held that distinct claims of attorney error can be combined to grant habeas relief on a cumulative-ineffective-assistance theory, the court must evaluate each alleged attorney error individually.  *See Williams v. Anderson*, 450 F.3d 789, 816 (6th Cir. 2006) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).

### a.  Failure to Investigate and Review Discovery

As an initial matter, Knoefel's failure-to-investigate and failure-to-review-discovery arguments make vague reference to "numerous witnesses" and "discovery produced by the state." ECF Doc. 1-1 at 3-5; ECF Doc. 9 at 6-9.  *What* discovery and *what* witnesses?  Knoefel's only specific allegation is that counsel failed to effectively elicit testimony from Ward.  *See generally* ECF Doc. 1-1 at 3-5; ECF Doc. 9 at 6-9.  If we look back to the similar arguments Knoefel raised before the Ohio Court of Appeals, we *could* nose up some references to other witnesses (such as Krisanne and Joseph Sutton).  *See* ECF Doc. 7-1 at 329; ECF Doc. 7-2 at 787. But "'[j]udges are not like pigs, hunting for truffles' that might be buried the record." *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  And it is improper to flesh out arguments that a party has not clearly raised in our adversarial system.  *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017).  Thus, any argument that counsel was ineffective for failing to investigate or

review discovery, other than with respect to Ward, is forfeited.[8]  *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (issues "adverted to in a perfunctory manner" are forfeited).

      With respect to Ward, the Ohio Court of Appeals reasonably determined that Knoefel failed to show that he was entitled to relief on an ineffective-assistance-of-counsel theory.  ECF Doc. 7-2 at 787-88; *Harrington*, 562 U.S. at 88-89.  Although the Ohio Court of Appeals did not specifically cite *Strickland*, it applied a two-pronged deficiency-and-prejudice standard consistent with *Strickland*.  ECF Doc. 7-2 at 784 (citing *State v. Jackson*, 64 Ohio St. 2d 107 (1980); *State v. Martin*, 151 Ohio St. 3d 470, 478 (2017)); *Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that a state court doesn't need to cite the applicable federal decision, but need only apply a rule consistent with that decision).  The court also defined prejudice in the same way as *Strickland*.  *Compare* ECF Doc. 7-2 at 784 ("'a reasonable probability that, but for counsel's errors the proceeding's result would have been different.'  [*Martin*, 151 Ohio St. 3d at 478].")， *with Strickland*, 466 U.S. at 494 ("a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

      Applying the correct standard and definition of prejudice, the Ohio Court of Appeals reasonably determined that Knoefel failed to meet his burden to point to evidence demonstrating that counsel's failure to elicit certain testimony from Ward had prejudiced him.  28 U.S.C. § 2254(d); *Bell*, 535 U.S. at 694; *Shriro*, 550 U.S. at 473; *Bobby*, 565 U.S. at 24; *Strickland*, 466 U.S. at 694.  The court explained that this was because the allegedly unelicited testimony would have been merely cumulative to: (1) testimony from other witnesses indicating that they did not suspect a sexual relationship between Knoefel and Zunich; and (2) testimony indicating that

---

[8] This conclusion does not apply to Knoefel's separately articulated arguments that counsel was ineffective for objecting to his own question and failing to call Dr. Stanisfer as a witness.  Those arguments are addressed individually in Sections IV.A.4.b. and IV.A.4.c., below.

Zunich was aware Lisa wanted her out of the home.  ECF Doc. 7-2 at 787.  Knoefel did not (and has not) presented any affidavit or statement by Ward indicating that she might have testified to anything more or different than what other witnesses said.  ECF Doc. 7-2 at 787; *see generally* ECF Doc. 1; ECF Doc. 1-1; ECF Doc. 9; Docket for N.D. Ohio Case No. 1:20-cv-1529.  And fair-minded jurists could agree that there wasn't a reasonable probability that the unelicited testimony would have changed the outcome of this case when:  (1) social worker Nichole Corbett had testified that she did not suspect an inappropriate sexual relationship; (2) youth services coordinator Latasha Stewart had testified that Zunich denied an inappropriate sexual relationship with Knoefel; (3) Krisanne Sutton had testified that she had no concerns regarding Knoefel's and Lisa's marriage; (4) Zunich had testified that she feared Lisa would force her to leave the home; (5) social worker Willie Smith had testified that Zunich was upset that Lisa was going to kick her out of the house; and (6) Willow Dennis had testified that Zunich said she hated her mom and was going to kill her.  *Mays*, manuscript op. at 6, 592 U.S. at ___; *Harrington*, 562 U.S. at 102-03; *Strickland*, 466 U.S. at 694; 28 U.S.C. § 2254(d)(2); ECF Doc. 7-1 at 200, 206, 208, 212 (¶¶33, 59, 68-69, 88-89).  Knoefel has not explained how having *one more* witness say these same things would have caused the jury to reach a different conclusion.

Because the Ohio Court of Appeals applied a standard consistent with clearly established federal law and reasonably determined that Knoefel was not prejudiced by trial counsel's alleged failure to elicit certain testimony from Ward, Knoefel cannot meet the doubly-deferential standard under *Strickland* and AEDPA.  28 U.S.C. § 2254(d); *Mays*, manuscript op. at 6, 592 U.S. at ___; *Harrington*, 562 U.S. at 88-89.  Thus, this portion of Knoefel's Ground One claim fails on the merits.

### b.    Counsel's "Objection" to His Own Question

Despite alleging that trial counsel was ineffective for objecting to his own question, Knoefel has not: (1) indicated *what* question counsel objected to; or (2) presented any argument describing how such an objection prejudiced him.  *See generally* ECF Doc. 1-1 at 2-5; ECF Doc. 9 at 6-9.  Knoefel's broad assertion that his argument meets the *Strickland* standard (*see* ECF Doc. 1-1 at 5, ECF Doc. 9 at 7) doesn't make it so.  *Cf. Huffer v. Bogen*, No. 1:10-cv-312, 2011 U.S. Dist. LEXIS 122752, at *12-13 (S.D. Ohio Oct. 24, 2011) ("[H]is 'saying so' does not make it so."); *Dishman v. Correct Car Sols., LLC*, No. 17-98, 2018 U.S. Dist. LEXIS 104517, at *20 (E.D. Ky. Jun. 22, 2018) ("[M]erely saying the allegations are clear does not make them so.").  He has to actually make the argument.  *Emerson*, 446 F. App'x at 736; *Brenay*, 709 F. App'x at 337.  But he hasn't.  *See generally* ECF Doc. 1-1 at 2-5; ECF Doc. 9 at 6-9.  This part of Knoefel's Ground One claim is, therefore, forfeited.  *McPherson*, 125 F.3d at 995.

Out of fairness to Knoefel (who shouldn't be punished for this derelict argumentation), the court could look to how the state court treated the same claim when he raised it in his direct appeal.  *But see Brenay*, 709 F. App'x at 337 (telling courts not to make up arguments that would support perfunctorily raised claims).  When Knoefel raised the same inadequately argued claim before the state court[9], he gave the Ohio Court of Appeals one nugget of information that doesn't appear in his habeas petition or traverse – an otherwise unexplained citation to "T.p. Vol. IX, p. 1492-93."  ECF Doc. 7-1 at 107.  The Ohio Court of Appeals took this citation and constructed for Knoefel a claim that counsel was ineffective for objecting to Zunich's response after he asked, "And do you know why Cody [Knoefel] moved?"  ECF Doc. 7-1 at 231-32; *see also* ECF

---

[9] Knoefel says that the claim he raised in state court wasn't vague.  *See* ECF Doc. 1-1 at 5, ECF Doc. 9 at 7.  But the record speaks for itself.  *See* ECF Doc. 7-1 at 107.  In any event, that doesn't matter because the Ohio Court of Appeals did not find the claim forfeited due to insufficient argumentation.  ECF Doc. 7-1 at 231.

Doc. 8-9 at 229-30 (Trial Transcript Vol. IX, p. 1492-93).  This was a reasonable construction, and Knoefel hasn't argued otherwise.

Addressing Knoefel's claim as construed, the Ohio Court of Appeals expressly applied the *Strickland* standard and reasonably concluded that Knoefel did "not demonstrate that trial counsel's performance was deficient or prejudicial to Kevin's interests."  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 687-90; *Mays*, manuscript op. at 6, 592 U.S. at ___; ECF Doc. 7-1 at 230-31 (¶¶ 150, 152).  The court specifically explained that: (1) counsel objected to Zunich's hearsay response, not his own question; (2) he *retracted* his question; and (3) the retraction of a single question during the course of a nine-day trial wasn't remarkable.  ECF Doc. 7-1 at 231 (¶154); *see also* ECF Doc. 8-9 at 229-30.  Viewing these facts in light of the entire record, a fair-minded jurist could agree there was no reasonable probability the outcome of Knoefel's case was affected by counsel's decision to retract his question and object to a hearsay response.  *Mays*, manuscript op. at 6, 592 U.S. at ___; *Harrington*, 562 U.S. at 102-03; *Strickland*, 466 U.S. at 694; 28 U.S.C. § 2254(d)(2).  This is especially so when: (1) counsel's "objection" was nullified when the court directed Zunich to respond to the question; (2) Zunich's response – "Before I got there he was planning on moving out * * * because he didn't like Lisa and Megan and so the only reason he stayed was because of me." – lacks any clear connection to the elements of the offenses and defenses in this case; and (3) Knoefel hasn't explained any such connection.  ECF Doc. 8-9 at 230; ECF Doc. 1-1 at 2-5; ECF Doc. 9 at 6-9; *see also* Ohio Rev. Code §§ 2903.01(A), 2923.01(A), 2923.03(A).  Thus, this court cannot conclude that the Ohio Court of Appeals decision was so lacking in justification that it resulted in an extreme malfunction in Ohio's criminal justice system.  *Mays*, manuscript op. at 6, 592 U.S. at ___; *Harrington*, 562 at 102-03.

Because the Ohio Court of Appeals applied a standard consistent with clearly established federal law and reasonably determined that Knoefel was not prejudiced by trial counsel's decision to withdraw his question and objection to Zunich's hearsay response, Knoefel cannot meet the doubly-deferential standard under *Strickland* and AEDPA.  28 U.S.C. § 2254(d); *Mays*, manuscript op. at 6, 592 U.S. at ___; *Harrington*, 562 U.S. at 88-89.

### c.    Failure to Call Dr. Stanisfer

The Ohio Court of Appeals also reasonably concluded that counsel was not constitutionally ineffective for not calling Dr. Stanisfer.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 687-90; *Mays*, manuscript op. at 6, 592 U.S. at ___; ECF Doc. 7-1 at 231.  Just as it had in addressing Knoefel's other ineffective-assistance claims, the court cited and applied the two-pronged deficiency and prejudice *Strickland* standard.  *Strickland*, 466 U.S. at 687-88; 28 U.S.C. § 2254(d); ECF Doc. 7-1 at 230-32.  And the court reasonably concluded that Knoefel didn't meet that standard because he didn't point to any evidence describing or otherwise indicate what Dr. Stanisfer might have said had she been called to testify.  28 U.S.C. § 2254(d); *Mays*, manuscript op. at 6, 592 U.S. at ___; ECF Doc. 7-1 at 231-32.  Without such a showing, Knoefel could not: (1) overcome the presumption that counsel exercised reasonable professional judgment in deciding not to call Dr. Stanisfer; or (2) meet his burden to show that the failure to call Dr. Stanisfer prejudiced him.  *Strickland*, 466 U.S. at 690, 694.  And Knoefel's habeas petition and traverse have not shored up this shortcoming.  He still hasn't said what Dr. Stanisfer might have testified to or presented any affidavit or other testimony from Dr. Stanisfer that might have conflicted with mental health evidence introduced at trial (which indicated that Zunich was mentally stable).  *See* ECF Doc. 1-1 at 3-5; ECF Doc. 9 at 6-9.  Without Knoefel showing what Dr. Stanisfer would have said, *no one* could conclude that Knoefel had demonstrated a

reasonable probability that the result of his trial would have been different had counsel called Dr. Stanisfer as a witness.  *Strickland*, 466 U.S. at 694.  Thus, we cannot conclude that the Ohio Court of Appeals decision was so lacking in justification that it resulted in an extreme malfunction in Ohio's criminal justice system.  *Mays*, manuscript op. at 6, 592 U.S. at ___; *Harrington*, 562 at 102-03.

Because the Ohio Court of Appeals applied a standard consistent with clearly established federal law and reasonably determined that Knoefel was not prejudiced when trial counsel didn't call Dr. Stanisfer as a witness, Knoefel cannot meet the doubly-deferential standard under *Strickland* and AEDPA.  28 U.S.C. § 2254(d); *Mays*, manuscript op. at 6, 592 U.S. at ___; *Harrington*, 562 U.S. at 88-89.  Thus, this portion of Knoefel's Ground One claim fails on the merits.

### d.  Post-Conviction Proceedings

In addition to the ineffective-assistance-of-counsel claims that Knoefel raised in his petition, Knoefel also states in his traverse that "trial counsel's ineffectiveness permeated through Petitioner's post-conviction practice as well."  ECF Doc. 9 at 8.  This cryptic statement does not advance Knoefel's claim, because it's not entirely clear whether Knoefel: (1) unartfully meant to write that his "[claim asserting] trial counsel's ineffectiveness [was presented throughout] Petitioner's post-conviction practice as well"; or (2) actually wants the court to evaluate whether "trial counsel's ineffectiveness *permeated*[10] Petitioner's post-conviction practice as well."  ECF Doc. 9 at 8.

The first translation doesn't really add anything to this case.  No one disputes that Knoefel raised his ineffective-assistance-of-trial-counsel claims in his post-conviction motion

---

[10] Spread throughout.  *Permeate*, OXFORD ENGLISH DICTIONARY, *available at* https://www.oed.com/view/ Entry/141199?redirectedFrom=permeated#eid (last visited April 7, 2021).

and amended/supplemental motions.  *See generally* ECF Doc. 7.  And the Ohio Court of Appeals specifically addressed on the merits the claims raised in his post-conviction petition  (except his claim regarding Dr. Stanisfer, which the court addressed on the merits on direct appeal).  ECF Doc. 7-1 at 230-32; ECF Doc. 7-2 at 784-88.

The second (literal) translation is easily resolved because: (1) claims first raised in a traverse are forfeited, *see Tyler*, 416 F.3d at 504; (2) trial counsel did not represent Knoefel in his post-conviction proceedings, ECF Doc. 7-1 at 329-929, ECF Doc. 7-2; and (3) there is no right to effective assistance of counsel in a post-conviction proceeding, *see* 28 U.S.C. §2254(i) ("The ineffectiveness or incompetence of counsel during . . . collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").  Thus, Knoefel cannot show that he is entitled to relief on any claim that trial counsel was ineffective during his post-conviction proceedings.

### 5. Ground One Summary

Because Knoefel has not shown that the Ohio Court of Appeals unreasonably determined that he failed to meet the requirements of *Strickland* or otherwise shown that trial counsel's performance was constitutionally ineffective, I recommend that Knoefel's Ground One claim be DENIED as meritless.

### B. Ground Two: Confrontation Clause

### 1. Parties' Arguments

In his Ground Two claim, Knoefel argues that the use of a hearsay statement by Lisa Knoefel – introduced through Strunk's testimony about what Knoefel said Lisa had said – violated his rights under the Confrontation Clause of the Sixth Amendment.  ECF Doc. 1 at 8; ECF Doc. 1-1 at 5-6.  Knoefel specifically asserts that Lisa's statement did not meet the Sixth

Amendment requirements articulated in *Crawford v. Washington*, 541 U.S. 36 (2004), because it was a testimonial statement, Lisa was not available at trial, and he did not have a prior opportunity to cross-examine her.  ECF Doc. 1-1 at 6.  Knoefel also contends that Lisa's statement "did not meet an exception to the hearsay rule."  ECF Doc. 1-1 at 6.

Warden Phillips responds that Knoefel's Ground Two claim is procedurally defaulted. ECF Doc. 7 at 23-25.  Warden Phillips argues that Knoefel failed to present the alleged violation of his confrontation rights because: (1) on direct appeal he argued only that the admission of Lisa's statements violated the Ohio Rules of Evidence and cited only Ohio law; (2) he did not present issues under a federal law standard, cite U.S. Supreme Court precedent, or reference the Sixth or Fourteenth Amendments in "any of the relevant portions of his brief on direct appeal"; and (3) the Ohio Court of Appeals' direct review focused on whether Strunk's testimony presented "double hearsay" in violation of Ohio law.  ECF Doc. 7 at 23-25.  And the presentation of a state law claim based on facts that might support a federal constitutional claim is insufficient to raise a federal constitutional claim.  ECF Doc. 7 at 23-24.  Further, Warden Phillips contends that Knoefel cannot overcome his procedural default because he has failed to argue in his habeas petition that: (1) cause and prejudice excuse his procedural default; or (2) his claim is based on new evidence of actual innocence.  ECF Doc. 7 at 27-28.  Warden Phillips also argues that Knoefel's Ground Two claim would fail even if not procedurally defaulted because: (1) it presents a non-cognizable challenge to an evidentiary ruling; and (2) this court must defer to the Ohio Court of Appeals' finding that any error in admitting Strunk's testimony about what Knoefel said Lisa said was harmless when other evidence in the record supported the state's theory that Lisa suspected Knoefel of having an affair with Zunich.  ECF Doc. 7 at 36-39.

In his traverse, Knoefel argues that his Ground Two claim is not procedurally defaulted because he "specifically challenged the improper admission of hearsay testimony in both his direct appeal and in his memorandum in support of jurisdiction to the Ohio Supreme Court." ECF Doc. 9 at 12.  Knoefel also contends that the Ohio Court of Appeals' unreasonably found that the admission of hearsay evidence was harmless.  ECF Doc. 9 at 13.  Knoefel asserts that Lisa's statement was hearsay because it was "specifically elicited for the purpose of supporting the allegation that a sexual relationship occurred."  ECF Doc. 9 at 13.  Knoefel argues that, because the hearsay statement was the only evidence of the affair, its admission contributed to his conviction and was not harmless.  ECF Doc. 9 at 13.

## 2.    Cognizability

To the extent Knoefel challenges the Ohio Court of Appeals determination that Lisa's statements described in Strunk's testimony about what Knoefel told him were not hearsay, Knoefel's argument is non-cognizable.  *See* ECF Doc. 9 at 13; *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  This is because hearsay for purposes of Ohio cases is defined under the Ohio Rules of Evidence, and the Ohio Court of Appeals specifically determined that the challenged statement was not hearsay (and was not otherwise inadmissible) under the Ohio Rules of Evidence.  *See* ECF Doc. 7-1 at 218-19; *State v. Knoefel*, 2015-Ohio-5207 at ¶¶116-18; Ohio Evid. R. 101(A) ("These rules govern proceedings in the courts of this state."); Ohio Evid. R. 801, *et seq.* (hearsay and its exceptions).  And this court is bound by the Ohio courts' interpretation of Ohio law.  *Olsen v. McFaul*, 843 F.3d 918, 929 (6th Cir. 1988).

Likewise, whether or not the Ohio Court of Appeals reasonably determined that the admission of the hearsay (or evidence subject to exclusion under Ohio R. Evid. 403) was

harmless is also not cognizable.  *Estelle*, 502 U.S. at 67-68.  Again, this is because the Ohio

Court of Appeals specifically reviewed whether *violations of Ohio law* were harmless *under*

*Ohio law*.  *See* ECF Doc. 7-1 at 218-19; *State v. Knoefel*, 2015-Ohio-5207 at ¶¶116-18.  And

although we would be bound by that conclusion if it were to review the non-cognizable issue of

whether the admission of such evidence violated the Ohio Rules of Evidence, *Olsen*, 843 F.3d at

929, the Ohio Court of Appeals' determination that any violation of the Ohio Rules of Evidence

was harmless isn't particularly relevant to the actually cognizable constitutional issue presented

in Knoefel's Ground Two claim, *cf. Idaho v. Wright*, 497 U.S. 805, 821-27 (1990) (evidence was

admissible under a state law hearsay exception, but still violated the Confrontation Clause);

*accord Lilly v. Va.*, 527 U.S. at 116, 137-38 (1999).[11]  Thus, any part of Knoefel's Ground Two

claim that challenges the Ohio courts' conclusions that Lisa's statement was not hearsay and that

any violation of the Ohio Rules of Evidence was harmless is non-cognizable.  *Estelle*, 502 U.S.

at 67-68.

### 3.      Procedural Default

Knoefel's Ground Two confrontation claim was procedurally defaulted.  Procedural

default is one of the many pitfalls that might block the way to merits review of a federal habeas

claim.  *See Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 826 (6th Cir. 2019).

Related to the concept of exhaustion (the pursuit of *available* state court remedies), procedural

default bars federal habeas review when: (1) the state courts didn't review the petitioner's claim

on the merits because he didn't comply with some state procedural rule; or (2) he failed to fairly

---

[11] This should not be read to mean that the court should just ignore the Ohio Court of Appeals' comments
in finding that the admission of Strunk's testimony about what Knoefel said Lisa said was harmless.
Some of the *factual findings* the Ohio Court of Appeals made in reaching its harmless error conclusion
(*e.g.*, that Lisa's statement was cumulative to other evidence) *are* relevant and entitled to a presumption
of correctness, as discussed in greater detail below.  *See* ECF Doc. 7-1 at 218-19; *State v. Knoefel*, 2015-
Ohio-5207 at ¶118; 28 U.S.C. § 2254(e)(1); *Wiggins*, 539 U.S. at 528-29; *Burt*, 571 U.S. at 18.

present the claim to the state courts while state court remedies were still available. *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). The second of these is relevant to Knoefel's Ground Two claim.

To determine if a petitioner failed to fairly present his claim while state court remedies were available, federal courts ask: (1) did the petitioner assert both the legal and factual basis for his claim through the state's ordinary review process; and (2) did state law still allow the petitioner to raise his claim at the time he filed his federal habeas petition. *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). If the petitioner didn't raise the federal constitutional issue at *every stage* of the state court review process, the claim is procedurally defaulted. *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010). It's particularly important that the petitioner presented his claim to the state courts as a federal constitutional issue and not just a similar issue under state law. *Williams*, 460 F.3d at 806 (citing *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). And a passing mention of the Constitution isn't enough. *Johnson v. Williams*, 568 U.S. 289, 299 ("[A] state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim."); *Gray v. Netherland*, 518 U.S. 152, 163-64 (1996) (A petitioner can't just make broad statements about the constitution, but must present the substance of his constitutional claim to the state courts.).

Because the procedural-default bar to federal habeas review is harsh, courts have created safety-valves. Petitioners can obtain review of procedurally defaulted claims if the show: (1) "cause," *i.e.* that something beyond his control kept him from complying with the state rule

44

or fairly presenting his claim; and (2) "prejudice," *i.e.* that, assuming the petitioner's constitutional claim has merit, there is a reasonable probability that a different verdict would have resulted if the alleged constitutional violation hadn't occurred.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012) (defining the test for prejudice and noting that the test is co-extensive with prejudice under *Strickland*'s ineffective-assistance-of-counsel standard).  A petitioner can also obtain review of a procedurally defaulted claim if his procedurally defaulted claim is based on new evidence that he was factually innocent of the crime of conviction.  *See Coleman*, 501 U.S. at 750 ("fundamental miscarriage of justice" exception to procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim would establish that the petitioner was "actually innocent."); *Bousley v. United States*, 523 U.S. 614, 623 (1998) ("[A]ctual[] innocen[ce]" means "factual innocence, not mere legal insufficiency."); *Schlup v. Delo*, 513 U.S. 298, 324 (1995) (An actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial.").

Here, it's obvious that Knoefel is confused about what "procedural default" of a *federal constitutional claim* is.  He says that the *hearsay claim* he raised in state court was sufficient to avoid procedural default of his *Confrontation Clause claim*.  ECF Doc. 9 at 12.  To his credit, Knoefel is correct that he raised his hearsay claim on direct appeal to the Ohio Court of Appeals and the Ohio Supreme Court.  ECF Doc. 7-1 at 70, 85-87, 239, 244-46.  And, although he didn't mention anything about the Constitution in his brief before the Ohio Court of Appeals, the section heading for his *hearsay claim* was:  "It is a violation of the Confrontation Clause for a witness's testimony to include a statement made by a defendant, when that statement contains the hearsay statement of a third party."  *Compare* ECF Doc. 7-1 85-87, 244-46 (*hearsay claim* in

text, citing only Ohio law), *with* ECF Doc. 7-1 at 244 (heading for *hearsay claim* in memorandum in support of jurisdiction).  But was this passing reference enough to raise the federal constitutional claim before the Ohio Supreme Court?  No, it wasn't.  *Johnson*, 568 U.S. at 299; *Gray*, 518 U.S. at 163-64; *see also United States v. Vasquez*, 899 F.3d 363, 381 (5th Cir. 2018) ("Alluding to an argument in a section heading is insufficient to present it on appeal."). Because the substance of the argument Knoefel raised before the Ohio Court of Appeals and Ohio Supreme Court was only a state law *hearsay claim* and did not include any reference to federal Confrontation Clause precedent, he failed to "fairly present" the substance of his Ground Two Confrontation Clause claim at each level of the Ohio courts' ordinary review process. *Williams*, 460 F.3d at 806; *O'Sullivan*, 526 U.S. at 848; *McMeans*, 228 F.3d at 681; *Thompson*, 598 F.3d at 285; *Koontz*, 731 F.2d at 368.  And, because the time to raise such a claim has long since expired, *see* Ohio App. R. 4(A), 26(B); Ohio S. Ct. Prac. R. 7.01(A)(4), his claim is procedurally defaulted.  *Williams*, 460 F.3d at 806; *O'Sullivan*, 526 U.S. at 848; *McMeans*, 228 F.3d at 681.

Knoefel has not raised *any* argument that his procedural default should be excused under either a cause-and-prejudice or actual-innocence theory.  *See generally* ECF Doc. 1-1; ECF Doc. 9 at 12-13; *Coleman*, 501 U.S. at 750.  Thus, such arguments are forfeited.  *Jenkins v. Foot Locker, Inc.*, 598 F. App'x 346, 348 (6th Cir. 2015) ("Arguments not presented to the magistrate [judge] are forfeited.").  Moreover, it's unlikely that Knoefel could show prejudice because (as discussed below) his Confrontation Clause argument would be meritless.  *Coleman*, 501 U.S. at 750.  And his confrontation claim is not based on new evidence of actual innocence.  *Coleman*, 501 U.S. at 750.  Therefore, Knoefel couldn't overcome his procedural default even if he'd tried to do so.  *Coleman*, 501 U.S. at 750.

### 4.    Confrontation Clause

Even though Knoefel's Ground Two claim is procedurally defaulted, the court may

nevertheless choose to deny the claim on the merits.  *Lambrix v. Singletary*, 520 U.S. 518, 525

(1997) (courts can ignore complicated procedural bar issues if the merits are easily resolvable

against the petitioner).  When a state court has not adjudicated a claim on the merits, the federal

habeas court reviews the claim *de novo*.  *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004).

The Confrontation Clause of the Sixth Amendment (made applicable to states through the

Fourteenth Amendment) states that "the accused shall enjoy the right . . . to be confronted with

the witnesses against him."  U.S. CONST. amend. VI.  To show that a statement introduced at trial

violated the Confrontation Clause, a petitioner must show that: (1) the statement was *testimonial*;

(2) the statement was used to *establish the truth of the matter asserted*; (3) the declarant was

unavailable; and (4) the defendant did not have a prior opportunity to cross-examine the

declarant.  *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011) (citing *Crawford v.

Washington*, 541 U.S. 36, 53-54, 59 n.9; *United States v. Davis*, 557 F.3d 660, 670 (6th Cir.

2009)).  "A statement is testimonial if a reasonable person in the declarant's position would have

anticipated the use of the statement in a criminal proceeding."  *Boyd*, 640 F.3d at 655 (citing

*United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)); *Michigan v. Bryant*, 562 U.S. 344,

358 (2011) (The crux of the inquiry is whether the statement was "procured with a primary

purpose of creating an out-of-court substitute for trial testimony.").

Obvious examples of *testimonial* statements include testimony at a preliminary hearing,

before a grand jury, or at a prior trial.  *Crawford*, 541 U.S. at 68.  Formal statements to

government officers are also *testimonial*.  *Id.* at 51.  Off-hand, overheard remarks are not.  *Id.*

Neither are statements made to police in response to ongoing emergencies. *Davis v. Washington*,

47

547 U.S. 813, 822 (2006).  A friend-to-friend *confession* isn't *testimonial*.  *Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013).  Casual remarks to friends aren't, either.  *Crawford*, 541 U.S. at 51.  And comments to family members are usually not *testimonial*.  *Bell v. Stoddard*, No. 14-12182, 2018 U.S. Dist. LEXIS 193834, at *15 (E.D. Mich. Nov. 14, 2018) (citing *Crawford*, 541 U.S. at 51-52, 56); *United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (statements to loved ones were not testimonial).

Knoefel has not met his burden to show that his confrontation rights were violated when the court allowed Strunk's testimony about what Knoefel said Lisa said.  Lisa's statements to Knoefel were not *testimonial*.  *Crawford*, 541 U.S. at 53-54; *Boyd*, 640 F.3d at 655.  The context of the entire situation described by Strunk – a friend on a camping trip griping about concerns his wife raised to him in private – does not indicate that a person in Knoefel's or Lisa's position would have anticipated that their statements would (or could) be used in place of testimony in a trial for Lisa's murder or for Knoefel's sexual assault of Zunich.  ECF Doc. 7-1 at 202; ECF Doc. 8-8 at 325-30; *State v. Knoefel*, 2015-Ohio-5207 at ¶39; *Boyd*, 640 F.3d at 655; *Cromer*, 389 F.3d at 675; *Bryant*, 562 U.S. at 358.  And casual remarks to friends and private comments between spouses are not the kinds of statements that courts have found to be testimonial.  *Crawford*, 541 U.S. at 51; *Bell*, 2018 U.S. Dist. LEXIS 193834, at *15; *Manfre*, 368 F.3d at 838 n.1.  Thus, because Knoefel couldn't get past this first prong of a Confrontation Clause claim, he cannot establish that the admission of Strunk's testimony about what he said Lisa had said violated his Sixth and Fourteenth Amendment right to confrontation.  *Crawford*, 541 U.S at 53-54; *Boyd*, 640 F.3d at 655.

Accordingly, even if Knoefel's Ground Two confrontation claim were not procedurally defaulted, I would recommend that Knoefel's Ground Two confrontation claim be denied as meritless.

### 5. Ground Two Summary

Because Knoefel's claim challenging the Ohio Court of Appeals' conclusion that Strunk's testimony about what he said Lisa had said was not hearsay is non-cognizable, I recommend that Knoefel's Ground Two claim be DIMSISSED in part as non-cognizable. And because Knoefel failed to fairly present to the Ohio courts his claim that the admission of Strunk's testimony violated his confrontation rights under the Sixth and Fourteenth Amendments, I recommend that Knoefel's Ground Two confrontation claim be DISMISSED as procedurally defaulted.

### C. Ground Three: Due Process and *Brady*

### 1. Parties' Arguments

In his Ground Three claim, Knoefel argues that the state withheld favorable evidence from him in violation of his right to due process under the Fifth and Fourteenth Amendments as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963). ECF Doc. 1 at 9; ECF Doc. 1-1 at 6-9. Specifically, Knoefel asserts that the state improperly withheld a December 2014 interview of Kari Saunders, during which Saunders said that "Zunich planned the murder of Lisa Knoefel with her ex-boyfriend and her friend Autumn." ECF Doc. 1-1 at 7. Knoefel contends that the state had a continuing duty to disclose the interview even though it was conducted *after* he was convicted. ECF Doc. 1-1 at 7. Knoefel also argues that he raised this issue in a motion for a new trial; the state trial court applied the wrong materiality standard under *United States v. Bagley*, 473 U.S. 667, 676 (1985); and the state trial court incorrectly found that the interview was

merely cumulative because no other evidence at trial had specifically indicated that Zunich fabricated Knoefel's involvement in Lisa's murder.  ECF Doc. 1-1 at 7-9.  Knoefel also asserts that the state further compounded the violation of his rights by opposing his motion for a new trial.  ECF Doc. 1-1 at 9.  And Knoefel says that he discovered additional witnesses who could give similar testimony (*i.e.*, Boyer and Amacher) after Saunders's interview was turned over to him.  ECF Doc. 1-1 at 7.

Warden Phillips responds that Knoefel's Ground Three claim was procedurally defaulted. ECF Doc. 7 at 25-26.  Warden Phillips argues that Knoefel failed to present *any* constitutional claim based on the delayed disclosure of Saunders's interview in his state post-conviction petitions and on direct appeal.  ECF Doc. 7 at 26.  And the Ohio Court of Appeals addressed in its decision only the claim that Knoefel did present – whether the state trial court abused its discretion in denying his petition without hearing after finding that he failed to support his claims with "credible instances of resulting prejudice."  ECF Doc. 7 at 26.  Warden Phillips also asserts that Knoefel's attempt to raise a *Brady* claim for the first time in his reply brief on direct appeal was improper and failed to give the state courts a full opportunity to resolve any constitutional issues related to the delayed disclosure of Saunders's interview.  ECF Doc. 7 at 26.  Further, Warden Phillips contends that Knoefel cannot overcome his procedural default because he has failed to argue in his habeas petition that: (1) cause and prejudice excuse his procedural default; or (2) his claim is based on new evidence of actual innocence.  ECF Doc. 7 at 27-28.  Warden Phillips also argues that if Knoefel's Ground Three claim was not procedurally defaulted, it would fail on the merits because Knoefel cannot show that Saunders's interview was material. ECF Doc. 7 at 42-43.  Specifically, Warden Phillips asserts that Knoefel has not pointed to any

evidence indicating that, had the interview been turned over earlier, the result of his trial would have been any different.  ECF Doc. 7 at 42-43.

In his traverse, Knoefel argues that his Ground Three claim is not procedurally defaulted because he specifically stated in his post-conviction motion and supplemental motion that "multiple Constitutional errors permeated the trial in this matter that demand a new trial be granted."  ECF Doc. 9 at 19.  He also asserts that he raised the constitutional issue on appeal from the denial of his post-conviction motion to both the Ohio Court of Appeals and the Ohio Supreme Court.  ECF Doc. 9 at 19-20.  Knoefel also contends that the Ohio Court of Appeals applied a standard inconsistent with Supreme Court precedent in evaluating his *Brady* claim and unreasonably determined that the Saunders interview was not material.  ECF Doc. 9 at 20-21.  Knoefel also asserts that we should look past any procedural default of his Ground Three claim because not reviewing his claim would result in a miscarriage of justice.  ECF Doc. 9 at 21.  Knoefel explains that a miscarriage of justice would result because: (1) his substantive rights were violated when Saunders's interview recording was withheld; (2) he would have been granted a new trial if the evidence were turned over earlier; and (3) any new trial would have had a different outcome.  ECF Doc. 9 at 21.

### 2. Procedural Default

As discussed above, a claim is procedurally defaulted (and barred from merits review) if the petitioner failed to fairly present his claim when state court remedies were available. *Wainwright*, 433 U.S. at 80, 84-87; *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.  And to fairly present a claim, the petitioner must have raised the constitutional issue at each stage of the state court review process.  *Thompson*, 598 F.3d at 285.  Raising a similar state law issue or

making a passing mention of the constitution isn't enough.  *Williams*, 460 F.3d at 806; *Koontz*, 731 F.2d at 368; *Johnson*, 568 U.S. at 299; *Gray*, 518 U.S. at 163-64.

Knoefel's Ground Three claim was procedurally defaulted because he failed to "fairly present" his claim at each stage in Ohio's review process.  *Wainwright*, 433 U.S. at 80, 84-87; *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806; *Thompson*, 598 F.3d at 285.  Knoefel did raise the issue in his March 2018 reply brief on appeal to the Ohio Court of Appeals and the court appears to have addressed the issue on the merits.  ECF Doc. 7-2 at 753-54, 788.  But he never expressly raised a *Brady* claim regarding the Saunders interview in his post-conviction proceedings before the state trial court.  ECF Doc. 7-1 at 329-39, 519, 523-34, 712-17, 730, 818-18, 823-36, 847-50; ECF Doc. 7-2 at 600-10, 618-24.  His vague reference to "constitutional rights guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments" wasn't enough.  *Williams*, 460 F.3d at 806; *Koontz*, 731 F.2d at 368; *Thompson*, 598 F.3d at 285; *Johnson*, 568 U.S. at 299; *Gray*, 518 U.S. at 163-64.  And, although Knoefel says he raised the claim before the Ohio Supreme Court, review of his memorandum in support of jurisdiction shows that: (1) he argued only that Saunders's interview was new evidence entitling him to a new trial under Ohio Crim. R. 33; and (2) he did not raise any *Brady/Bagley* or other constitutional claim that the state withheld the Saunders interview recording in violation of his federal constitutional rights.  ECF Doc. 7-2 at 820-29; *cf. United States v. Maxwell*, No. 20-5755, ___ F.3d ___, 2021 U.S. App. LEXIS 8098, at *6 (6th Cir., Mar 19, 2021) ("Efforts to rewrite the past are not easy.").  Thus, Knoefel deprived the Ohio Supreme Court of a full and fair opportunity to review his *Brady/Bagley* claim.  *Williams*, 460 F.3d at 806; *O'Sullivan*, 526 U.S. at 848; *McMeans*, 228 F.3d at 681; *Thompson*, 598 F.3d at 285.  And, because Ohio law no longer allowed Knoefel to

raise his claims at the time he filed his petition, his claim was procedurally defaulted.  *Williams*, 460 F.3d at 806; *O'Sullivan*, 526 U.S. at 848; *McMeans*, 228 F.3d at 681.

Knoefel's effort to excuse his procedural default on miscarriage-of-justice grounds is unavailing.  ECF Doc. 9 at 21.  A procedural default can be excused on miscarriage-of-justice grounds when the procedurally defaulted claim relies on new evidence of actual, factual innocence.  *Coleman*, 510 U.S. at 750; *Lundgren*, 440 F.3d at 764; *Bousley*, 523 U.S. at 623; *Schlup*, 513 U.S. at 324.  Knoefel's first two allegations of manifest injustice – that his rights were violated and that he would have satisfied the requirements for being granted a new trial – are examples of an alleged legal insufficiency, not actual innocence.  ECF Doc. 9 at 21; *Bousley*, 523 U.S. at 623.  As such, they cannot establish a manifest injustice that would excuse a procedural default.  *Coleman*, 510 U.S. at 750; *Lundgren*, 440 F.3d at 764.  To the extent Knoefel's allegation (that any new trial would have resulted in a different outcome) can be construed to assert that the Saunders interview is new evidence of actual, factual innocence, that argument also fails.  *See* ECF Doc. 9 at 21.  At most, the Saunders interview is impeachment evidence, which "will seldom, if ever" establish actual innocence.  *Sawyer v. Whitley*, 505 U.S. 333, 348-49 (1992); *Harrison v. Richard*, No. 17-3246, 2017 U.S. App. LEXIS 23219, at *6-7 (6th Cir., Aug. 17, 2017).  Thus, Knoefel has not shown that a manifest injustice will occur if we don't excuse the procedural default of his Ground Three claim.  *Coleman*, 510 U.S. at 750.

### 3.    **Due Process and *Brady***

Even if we were to reach the merits of Knoefel's *Brady* claim, it would still fail.  Because the Ohio Court of Appeals denied his *Brady* claim without providing any reasoning or explanation, the decision is not entitled to AEDPA deference.  ECF Doc. 7-2 at 788; *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific

53

*reasons* given by the state court and *defers to those reasons* if they are reasonable." (emphasis added)); *Thompson v. Skipper*, 981 F.3d 476, 480 n.1 (6th Cir. 2020).

A criminal defendant's due process rights are violated when the prosecution suppresses evidence that is both favorable to the defendant and material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To establish a *Brady* violation, a petitioner must show: (1) the evidence favors him because it is exculpatory or impeaching; (2) the state suppressed that evidence; and (3) the suppression of that evidence prejudiced him.  *England v. Hart*, 970 F.3d 698, 716 (6th Cir. 2020) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  The prosecution's duty to disclose favorable, material evidence under *Brady* is limited to *trial evidence*.  *District Att'y's Office for Third Judicial District v. Osborne*, 577 U.S. 52, 68 (2009).  And, while the prosecution has a continuing obligation to disclose exculpatory evidence that it had at the time of trial, *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987), that duty does not extend to evidence that came into the prosecution's possession *after* the defendant was adjudged guilty and sentenced, *Osborne*, 577 U.S. at 68-69.[12]  *See also Waterford v. Washburn*, 455 F. Supp. 3d 579, 610-11 (M.D. Tenn. 2020); *Gavitt v. Born*, 835 F.3d 623, 648 (6th Cir. 2016) (Even if "due process *could* be deemed to include such an obligation, it is not yet a matter of clearly established law."); *Howard v. Burt*, No. 17-1285, 2017 U.S. App. LEXIS 15237, at *10 (6th Cir., Aug. 9, 2017) (holding that a petitioner could not "rely on a 1998 letter and 2012

---

[12] In *Osborne*, the Supreme Court explained that *Brady* and Due Process under the U.S. Constitution did not provide the correct framework to address whether the state has an obligation to turn over evidence discovered after a conviction.  557 U.S. at 69.  This is because due process is generally concerned with pre-conviction trial rights protecting a criminal defendant's liberty interest.  *Id.* at 59, 68.  When a defendant has already been convicted after a fair trial, however, he is no longer entitled to a presumption of innocence and his interest in any later-discovered evidence must be analyzed in light of the fact that he was found guilty after a fair trial.  *Id.* at 69.

affidavit to establish his *Brady* claim because those documents were not available to the prosecution at the time of his trial in 1995").

"Prejudice (and materiality) is established by showing that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *England*, 970 F.3d at 717 (quoting *Bagley*, 473 U.S. at 682).  To clear this more-probable-than-not hurdle, the petitioner must show that a substantial likelihood of a different result that undermines confidence in the proceeding.  *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Bagley*, 473 U.S. at 678; *LaMar v. Houk*, 798 F.3d 405, 416 (6th Cir. 2015); *Harrington*, 562 U.S. at 112).  A "conceivable" possibility of a different result isn't enough.  *Id.* (citing *Harrington*, 562 U.S. at 112).

Because Knoefel cannot possibly show that the prosecution came into possession of Saunders's December 2014 interview until after his trial concluded (June 2104) and he was sentenced (August 2014), Knoefel cannot show that the state's delay in disclosing that interview violated *Brady* or the Due Process Clause.  *Osborne*, 577 U.S. at 68-69; *Waterford*, 455 F. Supp. 3d at 610-11; *Gavitt v. Born*, 835 F.3d at 648.  Moreover, Knoefel cannot show that he was prejudiced.  *England*, 970 F.3d at 717; *Bagley*, 473 U.S. at 682.  As the Ohio Court of Appeals explained, the jury had (and rejected) other evidence that Zunich was a liar, had other reasons for wanting to murder Lisa, and may have falsely implicated Knoefel.  ECF Doc. 7-2 at 806-07; *see also* ECF Doc. 7-1 at 204-06, 208-09, 212-13 (¶¶51-53, 56, 59, 68, 71, 91).  An additional statement by Zunich's former jailhouse lover might create a "conceivable" possibility that the jury might have weighed the evidence differently.  *England*, 970 F.3d at 717; *Harrington*, 562 U.S. at 112.  But, in light of all the evidence before the jury, Saunders's interview doesn't create a substantial likelihood that the jury would have found that Zunich was lying about Knoefel's

involvement in planning Lisa's murder.  *England*, 970 F.3d at 717; *Harrington*, 562 U.S. at 112; *Kyles*, 514 U.S. at 435 (the court must consider the undisclosed evidence in light of all the evidence as a whole).  Accordingly, Knoefel's Ground Three claim would be meritless, even if it was not procedurally defaulted.

### 4.        Ground Three Summary

Because Knoefel's Ground Three claim was procedurally defaulted and he has not met any of the requirements for overcoming procedural default, I recommend that Knoefel's Ground Three claim be DISMISSED as procedurally defaulted.

### D.        Ground Four: *Res Judicata*

### 1.        Parties' Arguments

In his Ground Four claim, Knoefel asserts that the state trial court erred when it found that his post-conviction claims were barred under Ohio's *res judicata* rule.  ECF Doc. 1 at 11; ECF Doc. 1-1 at 10-12.  Knoefel asserts that it is difficult to differentiate between claims that must be presented on direct review and claims that must be raised in a post-conviction petition, in order to avoid the application of Ohio's *res judicata* rule.  ECF Doc. 1-1 at 10-11.  Knoefel also contends that the application of Ohio's *res judicata* rule in his state post-conviction proceedings was inconsistent with the U.S. Supreme Court's decision in *Sanders v. United States*, 373 U.S. 1, 8 (1963).  ECF Doc. 1-1 at 12.

Warden Phillips responds that Knoefel's Ground Four claim is non-cognizable and procedurally defaulted.  ECF Doc. 7 at 27, 43-45.  Warden Phillips contends that Knoefel's Ground Three claim is non-cognizable because it: (1) seeks review of a state court ruling on a matter of state law; and (2) does not challenge his underlying conviction or detention.  ECF Doc. 7 at 43-44.  Warden Phillips also argues Knoefel's Ground Four claim is procedurally

defaulted because he failed to present his challenge on direct appeal to the Ohio Court of Appeals and the Ohio Supreme Court.  ECF Doc. 7 at 27.  Instead, Knoefel challenged only whether the trial court had abused its discretion in denying his post-conviction petition without a hearing.  ECF Doc. 7 at 27.  Further, Warden Phillips asserts that Knoefel cannot overcome his procedural default because he has failed to argue in his habeas petition that: (1) cause and prejudice excuse his procedural default; or (2) his claim is based on new evidence of actual innocence.  ECF Doc. 7 at 27-28.

In his traverse, Knoefel argues that Warden Phillips' cognizability argument "fails to consider that the doctrine of *res judicata* is not simply [a] State law doctrine but is recognized under Federal law."  ECF Doc. 9 at 26.  Knoefel further asserts that, because his liberty is at stake, barring review of his Ground Four claim would be a miscarriage of justice.  ECF Doc. 9 at 26.

### 2.    Cognizability

Knoefel's Ground Four claim is non-cognizable.  A claim alleging state law violations is not cognizable.  *Estelle*, 502 U.S. at 68; *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  Knoefel's argument that the Ohio court improperly applied Ohio's *res judicata* rule is a non-cognizable state law claim, not a federal habeas claim.  *Estelle*, 502 U.S. at 68; *Lewis v. Jeffers*, 497 U.S. at 780.  Knoefel's assertion that it's a federal claim because federal courts also have a *res judicata* rule is unavailing.  Even if the Ohio and federal *res judicata* rules were exactly the same and were developed through historically indistinguishable precedent (they aren't and weren't), the rules are distinct.  *Cf. Doe v. Jackson Local Schs. Sch. Dist.*, 422 F. App'x 497, 500 (6th Cir. 2011) (distinguishing between the application of federal *res judicata* and Ohio *res judicata*); *Landrum v. Mitchell*, 625 F.3d 905, 934 (6th Cir. 2010) (recognizing Ohio's *res judicata* rule as

an independent and adequate *state* ground to foreclose habeas relief). Moreover, it is nearly axiomatic that an alleged error – even one that rises to the level of a constitutional error – in a state court post-conviction proceeding is not cognizable because an alleged error in a post-conviction proceeding does not attack the underlying conviction or custody. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986); *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *Altman v. Winn*, No. 14-2334, 2015 U.S. App. LEXIS 23021, at *10-11 (6th Cir., May 11, 2015); *In re Dixon*, No. 20-3308, 2020 U.S. App. LEXIS 26809, at *4 (6th Cir., Aug. 21, 2020).

Also haunting Knoefel's Ground Four claim is the looming reality that it is patently meritless. The Ohio Court of Appeals *specifically overruled* the state trial court's application of *res judicata* as to most of Knoefel's post-conviction ineffective assistance of counsel claims, reviewed the claims on the merits, and rejected them. ECF Doc. 7-2 at 786-88. The one issue on which the court did not overrule the application of *res judicata* was fully litigated and denied on the merits on direct appeal. ECF Doc. 7-1 at 230-32; ECF Doc. 7-2 at 786. We would have a right to expect habeas counsel to have reviewed the record and known this. This is doubly so when habeas counsel actually represented Knoefel in both his direct appeal and state post-conviction proceedings.

Moreover, *Sanders* does not say that state courts are not allowed to apply state *res judicata* rules to preclude post-conviction review of claims that could have been presented on direct review. In *Sanders*, the Supreme Court reviewed whether the Ninth Circuit properly held that the Northern District of California did not abuse its discretion by applying federal *res judicata* principles to bar review of a federal prisoner's second 28 U.S.C. § 2255 motion to vacate when the movant could have presented his claim in his first motion. 373 U.S. at 5-6. Writing about 33 years before AEDPA imposed significant *res judicata*-like restrictions on

successive § 2255 motions (and § 2254 petitions), the Court determined that federal *res judicata*
did not preclude § 2255 movants from presenting in successive § 2255 motions claims that could
have been presented in initial § 2255 motions. *Id.* at 7-15 (specifically noting that the application
of *res judicata* in the context of successive § 2255 motions would deprive federal prisoners of
the same type of remedy provided to state-prisoner habeas corpus petitioners proceeding under
28 U.S.C. § 2254). The decision was not at all related to whether the Constitution is offended
when a *state court* applies *state procedural law* to preclude review of claims in a *state post-
conviction proceeding. See generally id.* So Knoefel cannot show that the state court's decision
was "contrary to, or involved an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States" in *Sanders.* 28 U.S.C. § 2254(d)(1);
*Sanders*, 373 U.S. at 7-15. And Knoefel has made *no* argument that the issue was an
unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2); *see generally* ECF Doc. 1-1;
ECF Doc. 9. Therefore, even if Knoefel's Ground Four claim were cognizable, he could not
meet his burden to show that he is entitled to relief.

### 3.    Ground Four Summary

Because Knoefel's Ground Four claim challenging the Ohio courts' application of *res
judicata* is non-cognizable (and meritless when the Ohio Court of Appeals actually denied his
claims *on the merits*), I recommend that Knoefel's Ground Four claim be DISMISSED as
non-cognizable.

## V.    Certificate of Appealability

### A.    Legal Standard

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts,
28 U.S.C. foll. § 2254, provides that "{t}he district court must issue or deny a certificate of

appealability ("COA") when it enters a final order adverse to the applicant."  Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks the requirement of 28 U.S.C. § 2253(c)(3) that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253 (c)(2)."  Rule 11(a).   In light of the Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the COA issue is included here.

Under 28 U.S.C. § 2253(c)(1)(A), this court will grant a COA for an issue raised in a §2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right.  *See, Cunningham v. Shoop,* 817 F. App'x 223, 225 (6th Cir. Aug 24, 2020).  A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis,* 137 S. Ct. 759, 773 (2017) (quoting *Miller-El v. Cockrell,* 537 U.S. 322, 327, 336 (2003)); *see also Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  When a claim is denied on procedural grounds, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack,* 529 U.S. at 484.

**B.    Analysis**

If the Court accepts my recommendations, Knoefel will not be able to show that the Court's rulings on his claims are debatable among jurists of reason.  Knoefel's Ground One claim is meritless.  His Ground Two claim is non-cognizable in part and both procedurally

defaulted and meritless in part.  His Ground Three claim is procedurally defaulted and meritless.

And his Ground Four claim is non-cognizable and patently meritless.

Because jurists of reason would not find debatable that habeas relief is not available for

any of the claims raised in Knoefel's petition, I recommend that no certificate of appealability

issue in this case.

## VI.     Recommendation

Because all of Knoefel's claims are procedurally defaulted, non-cognizable, and/or

meritless, I recommend that all of Knoefel's claims be DISMISSED and that his petition for writ

of habeas corpus be DENIED.  I further recommend that Knoefel not be granted a certificate of

appealability.


Dated: April 23, 2021

Thomas M. Parker
United States Magistrate Judge


_____


**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  *See*
*U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).